USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1349 UNITED STATES OF AMERICA, Appellee, v. WALTER DeJESUS ZAPATA, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _________________________ Steven J. Rappaport, with whom Rappaport, Freeman & Pinta ____________________ ___________________________ was on brief, for appellant. R. Bradford Bailey, Assistant United States Attorney, with ___________________ whom A. John Pappalardo, United States Attorney, was on brief, ___________________ for appellee. _________________________ March 24, 1994 _________________________ SELYA, Circuit Judge. This appeal presents questions SELYA, Circuit Judge. _____________ concerning the legality of an investigatory stop, a warrantless automobile search, and an ensuing interrogation. Contrary to appellant's importuning, we hold that the Supreme Court's opinion in California v. Hodari D., 499 U.S. 621 (1991), did not __________ __________ reconfigure the doctrine of Terry v. Ohio, 392 U.S. 1 (1968), _____ ____ and, therefore, did not transmogrify the law governing investigatory stops. Thus, we conclude on the facts of this case that a slight physical touching by a police officer, effected under circumstances falling short of probable cause, did not in itself transform a lawful Terry stop into an unlawful de facto _____ __ _____ arrest. Discerning no clear error in the district court's remaining findings that defendant consented to the challenged search (a search that yielded evidence which in any event inevitably would have been discovered) and that neither the seized evidence nor the statements to the police should be suppressed we affirm the judgment of conviction. I. FACTUAL BACKGROUND I. FACTUAL BACKGROUND We offer a decurtate summary of the events pertinent to this appeal, recounting them in a manner consistent with the district court's supportable findings of fact. Upon being alerted by a reliable informant about narcotics-related activity at a certain dwelling in Lowell, Massachusetts, the federal Drug Enforcement Administration (DEA) mounted a surveillance. On February 4, 1992, federal agents observed defendant-appellant Walter DeJesus Zapata drive from the 2 site of the surveillance to another address.1 He entered a house at that address and helped to load two duffel bags into the trunk of a second car. Appellant departed in the laden vehicle. He drove in an unorthodox manner, bobbing, weaving, continually changing lanes, and alternating driving speeds. Finally, he swerved sharply from a high-speed throughway into an adjacent rest area, without signalling. The trailing DEA agent followed and radioed for help. By this time, the authorities had verified that the car driven by appellant was unregistered and uninsured.2 Appellant left his vehicle and entered a fast-food restaurant. Four law enforcement officers followed him inside; only one of the officers, state trooper Dockrey, was in uniform and carrying a visible weapon. A fifth officer watched the entire exchange, unseen, from a distance. As the quartet approached appellant, Trooper Dockrey placed his palm on appellant's back for two or three seconds, gestured away from the crowd, and politely asked appellant to accompany the officers to a secluded corner of the restaurant. Appellant complied. A discussion ensued. When appellant stated that he had been dropped off at the rest area by anonymous "friends," the officers  ____________________ 1The trial record reflects, and appellant's counsel confirmed at oral argument, that contrary to the more prevalent Hispanic custom appellant prefers to use the last of his given names as his surname. We will, therefore, honor his nomenclative preference and refer to him as "Zapata." 2In Massachusetts, it is unlawful to operate on a public highway a motor vehicle that is unregistered, see Mass. Gen. Laws ___ ch. 90, 9 (1986), or one that is uninsured, see id. 34J. ___ ___ 3 informed him that they knew this to be a lie. They then suggested that appellant accompany them to the parking lot. Once again, appellant agreeably acquiesced. The party proceeded to the spot where appellant had parked the vehicle in which he had arrived. The officers inquired if they might search the automobile but they did not tell appellant that he had the right to withhold his consent. Appellant replied, "Sure, go ahead," and, upon request, relinquished the keys. The officers found the two duffel bags in the trunk. In response to a question, appellant denied knowing who owned them. One of the bags was partially unzipped. Through the opening, the officers spied a type of packaging commonly used for cocaine. An officer removed the package, dropped it onto the nearby fender, and watched as it emitted a puff of white powder. Further examination disclosed approximately 25 kilograms of cocaine. At that point, the DEA agents arrested appellant, handcuffed him, and read his Miranda rights once in Spanish and twice in English. _______ Appellant promptly confessed that he was en route to a rendezvous with drug traffickers. II. PROCEEDINGS BELOW II. PROCEEDINGS BELOW On February 26, 1992, a federal grand jury returned a two-count indictment charging Zapata and two codefendants with conspiracy to possess cocaine, intending to distribute the drug, and with the underlying substantive offense. See 21 U.S.C.  ___ 846, 841(a)(1); see also 18 U.S.C. 2 (aiding and abetting). On ___ ____ 4 March 26, Zapata filed a motion to suppress in which he claimed an illegal search and seizure. He sought to suppress, inter _____ alia, the cocaine found in the automobile and the statements he ____ had made to law enforcement officers after his arrest. Following a three-day evidentiary hearing, the court below concluded that, when the officers originally approached appellant, they had a satisfactory basis for reasonable suspicion. In light of the factual predicate the informer's tip, the observations made during the surveillance, and the elusive manner in which appellant drove to the rest area we regard this finding as irreproachable. See, e.g., United States ___ ____ _____________ v. Sokolow, 490 U.S. 1, 7-8 (1989) (explaining that "reasonable _______ suspicion" sufficient to undergird investigatory stop must be based on "articulable facts" drawn from "the totality of the circumstances"); United States v. Villanueva, ___ F.3d ___, ___ ______________ __________ (1st Cir. 1994) [No. 93-1502, slip op. at 5] (similar). And we note that the officers' suspicions were understandably heightened as events at the rest area unfolded. Turning to the nature of the detention, the court pointed out that, in the initial encounter, the police neither restricted appellant's movements nor prevented him from leaving the scene. At all times, the officers' demeanor was non- coercive; they spoke courteously, in low, non-threatening tones, and with the lone exception of Trooper Dockrey's pat on the back refrained from touching appellant, encircling him, or brandishing their weapons. The court also determined that 5 appellant fully understood what was happening, and "seemed eager to cooperate." In sum, the initial detention amounted merely to an investigatory stop, justified by reasonable suspicion.3 See, ___ e.g., Terry, 392 U.S. at 21; United States v. Streifel, 781 F.2d ____ _____ _____________ ________ 953, 957 (1st Cir. 1986). Taking matters a step further, the court ruled that, because appellant voluntarily consented to the car search, no basis existed for suppression of the items taken from the trunk. The court also ruled appellant's confession to be admissible because he had waived his Fifth Amendment privilege against self- incrimination in compliance with the Miranda requirements. _______ Accordingly, the court denied the motion to suppress. Thereafter, a jury found appellant guilty on both counts of the indictment. On March 16, 1993, the district court imposed a ten-year incarcerative sentence. In this appeal, appellant contests only the denial of his suppression motion. III. STANDARD OF REVIEW III. STANDARD OF REVIEW A district court's findings of fact on a motion to suppress are reviewable only for clear error as to consent, see ___ United States v. Miller, 589 F.2d 1117, 1130 (1st Cir. 1978), _____________ ______ cert. denied, 440 U.S. 958 (1979), probable cause, see United _____ ______ ___ ______ States v. Aguirre, 839 F.2d 854, 857 (1st Cir. 1988), and all ______ _______ other factbound matters, see, e.g., United States v. Rutkowski, ___ ____ ______________ _________  ____________________ 3The court also found that, had the initial seizure risen to the level of an arrest, it would have been illegal because probable cause did not exist at that time. The government says that this finding is patently erroneous. We need not reach the question and take no view of it. 6 877 F.2d 139, 141 (1st Cir. 1989) (reviewing district court's findings as to applicability of "plain view" exception under the "clearly erroneous" rule). This deferential standard requires that an appellate court exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand. Notwithstanding the deference with which factual findings are to be treated, questions of law remain subject to de __ novo review. This phenomenon sets the stage for a more nuanced ____ statement of appellate practice in Fourth Amendment cases. In scrutinizing a district court's denial of a suppression motion, the court of appeals will review findings of fact for clear error, while at the same time subjecting the trial court's ultimate constitutional conclusions to plenary oversight. See ___ United States v. Infante-Ruiz, ___ F.3d ___, ___ (1st Cir. 1994) ______________ ____________ [No. 93-1175, slip op. at 4]; United States v. Sanchez, 943 F.2d _____________ _______ 110, 112 (1st Cir. 1991). IV. ANALYSIS IV. ANALYSIS Appellant argues that the initial seizure of his person amounted to a de facto arrest; that he did not voluntarily __ _____ consent to the subsequent search; that the contraband found in the car's trunk would not necessarily have been discovered; and that the illegal practices in which the agents engaged rendered both the fruits of the search and the ensuing confession inadmissible. We subdivide this multi-layered argument into several components. 7 A. The Initial Encounter. A. The Initial Encounter. _____________________ There is no scientifically precise formula that enables courts to distinguish between investigatory stops, which can be justified by reasonable suspicion, and other detentions that the law deems sufficiently coercive to require probable cause detentions that are sometimes called "de facto arrests." See __ _____ ___ Florida v. Royer, 460 U.S. 491, 506 (1983) (opinion of White, _______ _____ J.); United States v. Quinn, 815 F.2d 153, 156 (1st Cir. 1987). _____________ _____ The conventional method of classification in respect to such detentions consists of asking whether "a reasonable man in the suspect's position would have understood his situation," in the circumstances then obtaining, to be tantamount to being under arrest. Berkemer v. McCarty, 468 U.S. 420, 442 (1984); accord ________ _______ ______ Quinn, 815 F.2d at 157. In suggesting an affirmative answer to _____ this inquiry, appellant highlights two arguably coercive facts: the presence of five lawmen and the physical touching effected by Trooper Dockrey. Despite these circumstances, we cannot say that the district court erred in assessing the initial encounter and concluding that a reasonable person, standing in appellant's shoes, would have felt unrestrained. The encounter occurred in a public place. Most of the officers were in plain clothes. Their approach was measured, their words polite, their conduct not bellicose. They neither voiced threats nor brandished their weapons. Certainly, the atmosphere at the scene was visibly less coercive than in Quinn, a case in which we overturned the _____ 8 district court's finding that a reasonable person would have thought himself under arrest given the presence of five police officers, a sniffing dog, and a vehicle obstructing egress, see ___ Quinn, 815 F.2d at 155. Taking into account the full panoply of _____ relevant facts, including the demeanor and deportment of the investigating officers and the tenor of their remarks, we cannot, without more, set aside the trial court's supported finding that the initial encounter did not function as a de facto arrest. __ _____ Mere numbers do not automatically convert a lawful Terry stop _____ into something more forbidding. Nonetheless, the government is not entirely out of the woods. Appellant, adverting to the slight physical touching, constructs an arresting argument based on certain language contained in California v. Hodari D., 499 U.S. 621 (1991). In __________ _________ Hodari, a group of youths who were under no suspicion  ______ reasonable or otherwise panicked and ran when a patrol car passed. The police pursued. During the chase, Hodari one of the fleeing youths discarded a "rock" of crack cocaine. Soon after, a police officer tackled him. See id. at 622-23. The ___ ___ government charged Hodari with a narcotics offense and offered the cocaine as evidence against him. The jury found him guilty. On appeal, Hodari challenged the government's right to introduce the evidence. Its admissibility turned on the question of when the police "seized" Hodari at the moment the chase began or at the time of the tackle. See id. at 623-24. Justice ___ ___ Scalia, writing for the Court, stated that an arrest may 9 transpire in one of two ways: "An arrest requires either ______ physical force . . . or, where that is absent, submission to the __ __________ assertion of authority." Id. at 626. Despite the seeming ___ breadth of this language, it is important to recognize that Hodari focused on the second branch of this disjunctive furcula; ______ the Court made new law by holding that, absent force, a seizure is not effected until the suspect has submitted. See id. ___ ___ Appellant attempts to stretch Hodari past the breaking ______ point. He uses as a lever the Court's statement that "an arrest is effected by the slightest application of physical force." Id. ___ at 625. Suggesting that this statement be read literally, appellant urges that courts must find an illegal arrest whenever, in the absence of probable cause, the most ephemeral physical contact is made between a police officer and a suspect. This construct is not original. The Seventh Circuit recently rejected a virtually identical argument, holding that, Hodari notwithstanding, a constructive arrest occurs only when ______ the touch first effects a seizure, but not when an investigatory stop (itself a form of seizure) is already in progress at the time of the contact. See United States v. Weaver, 8 F.3d 1240, ___ _____________ ______ 1244-45 (7th Cir. 1993). We believe that Weaver reaches the ______ correct result and that there is a simple, direct way to reconcile Hodari with cases involving Terry stops. ______ _____ In Hodari, Justice Scalia used the term "arrest" in its ______ common law sense. He understood common law arrest to be coterminous with the modern conception of "seizure of the 10 person." Hodari, 499 U.S. at 627 n.3. The Court neglected to ______ distinguish between different types of seizures, presumably for two reasons: the distinction was not directly relevant, and, in any event, the Court's decision rested exclusively on authorities dating from the pre-Terry era an era when there was perfect _____ congruence between the terms "arrest" and "seizure." See id. at ___ ___ 624-27. Properly understood, the passage in Hodari upon which ______ appellant relies merely restates the traditional test for a seizure. See, e.g., Terry, 392 U.S. at 19 n.16 ("Only when the ___ ____ _____ officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred."). Hodari's solitary innovation is to ______ add the requirement that the suspect submit. See Hodari, 499 ___ ______ U.S. at 626. Glimpsed in this light, Hodari cannot bear the weight ______ that appellant piles upon it. After all, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the ______________________ right to use some degree of physical coercion." Graham v. ______ Connor, 490 U.S. 386, 395 (1989) (emphasis supplied). Indeed, ______ the concept of an investigatory stop was conceived and nurtured in cases involving protective pat-downs, see Terry, 392 U.S. at ___ _____ 20-30; Ballou v. Massachusetts, 403 F.2d 982, 985 (1st Cir. ______ _____________ 1968), cert. denied, 394 U.S. 909 (1969), and it is by definition _____ ______ impossible to frisk or pat down a suspect without physically touching him. Then, too, the Court has consistently 11 characterized actions far more corporal than mere touchings as proper investigatory accouterments, see, e.g., Sokolow, 490 U.S. ___ ____ _______ at 7 (upholding investigatory stop although officers grabbed the suspect by the arm and moved him onto the sidewalk); see also ___ ____ United States v. Montoya de Hernandez, 473 U.S. 531, 534, 541 _____________ _____________________ (1985) (upholding relatively intrusive border search of defendant's person without requiring an antecedent showing of probable cause). Given both the persuasiveness and the prevalence of these precedents, we join the Seventh Circuit in rejecting the notion that an unheralded dictum in Hodari worked a ______ sea change in the law by imposing a probable cause requirement for all de minimis uses of force, including those incidental to __ _______ legitimate Terry stops. _____ On this understanding of Hodari, we cannot say that the ______ lower court erred in concluding that no de facto arrest occurred. __ _____ Although an officer did touch appellant, that datum merely establishes that a seizure occurred; it does not dispose of the question of what sort of seizure took place.4 What is decisive in this case is that nothing the officers did, alone or in combination, including the modest laying-on of hands, sufficed to convert the investigatory stop already in progress into an arrest. See, e.g., United States v. Willis, 967 F.2d 1220, 1223 ___ ____ _____________ ______  ____________________ 4Of course, the fact of physical contact is relevant to the reasonableness of a suspect's perception that he is under arrest. See United States v. Perea, 986 F.2d 633, 645 (2d Cir. 1993). In ___ _____________ _____ this case, the district court, after factoring this information into the calculus, determined that no de facto arrest occurred. __ _____ That exercise in factfinding did not constitute clear error. 12 (8th Cir. 1992) (holding, post-Hodari, that patting down a ______ suspect does not automatically convert a Terry stop into a de _____ __ facto arrest); Tom v. Voida, 963 F.2d 952, 958 (7th Cir. 1992) _____ ___ _____ (similar; handcuffing of suspect does not automatically convert Terry stop into de facto arrest). Since there is no serious _____ __ _____ doubt that reasonable suspicion existed at the time of the stop the totality of the circumstances plainly supports the lower court's assessment the "seizure" in this case was lawful. B. Voluntariness of Consent. B. Voluntariness of Consent. ________________________ Next, appellant asseverates that the district court erred in concluding that he voluntarily consented to the automobile search. We do not agree. The court had before it evidence of express consent, along with evidence of consent inferable from conduct. Appellant freely surrendered the keys to both the doors and the trunk; and it is settled law that the act of handing over one's car keys, if uncoerced, may in itself support an inference of consent to search the vehicle. See ___ United States v. Patrone, 948 F.2d 813, 816 (1st Cir. 1991), ______________ _______ cert. denied, 112 S. Ct. 2953 (1992); see also Miller, 589 F.2d _____ ______ ___ ____ ______ at 1131 (holding to like effect when defendant unlocked his vehicle upon request). It is equally well settled that a general consent to search a motor vehicle subsumes the specific consent to search any easily accessible containers within the vehicle. See, e.g., Florida v. Jimeno, 500 U.S. 248, ___, 111 S. Ct. 1801, ___ ____ _______ ______ 1804 (1991). Nothing occurred in this case to neutralize the 13 inference of consent. Although appellant harps on the officers' failure to inform him of his right to refuse permission, the rule is that a failure to inform a suspect that he is entitled to withhold his consent to a vehicle search, though relevant to the issue of voluntariness, does not preclude a finding of consent. See, e.g., Schneckcloth v. Bustamonte, 412 U.S. 218, 231-32, 249 ___ ____ ____________ __________ (1973); United States v. Lopez, 911 F.2d 1006, 1011 (5th Cir. _____________ _____ 1990); United States v. Crespo, 834 F.2d 267, 271-72 (2d Cir.), _____________ ______ cert. denied, 485 U.S. 1007 (1988); United States v. Lemon, 550 _____ ______ _____________ _____ F.2d 467, 472 n.5 (9th Cir. 1977); Leeper v. United States, 446 ______ _____________ F.2d 281, 284 (10th Cir. 1971), cert. denied, 404 U.S. 1021 _____ ______ (1972); United States ex rel. Harris v. Hendricks, 423 F.2d 1096, ____________________________ _________ 1101 (3d Cir. 1970); Gorman v. United States, 380 F.2d 158, 164 ______ ______________ (1st Cir. 1967). Because the duffel bags were lying in the trunk, appellant's general consent to a search of the automobile constituted consent to a search of the duffel bags. See Jimeno, ___ ______ 111 S. Ct. at 1804; United States v. Ross, 456 U.S. 798, 820-21 _____________ ____ (1982). What is more, there is a synergistic effect at work here, in that appellant's disclaimer of any ownership interest in the bags strengthens the case for a finding of consent. One who abandons ownership forfeits any entitlement to rights of privacy in the abandoned property, see Abel v. United States, 362 U.S. ___ ____ ______________ 217, 240-41 (1960), and one who disclaims ownership is likely to 14 be found to have abandoned ownership,5 see, e.g., United States ___ ____ _____________ v. Santos Ferrer, 999 F.2d 7, 9 (1st Cir.), cert. denied, 114 S. ______________ _____ ______ Ct. 562 (1992); United States v. Torres, 949 F.2d 606, 608 (2d ______________ ______ Cir. (1991); United States v. Frazier, 936 F.2d 262, 264-65 (6th _____________ _______ Cir. 1991); United States v. Ruiz, 935 F.2d 982, 984 (8th Cir. _____________ ____ 1991); United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. _____________ ________ 1991). Phrased another way, disclaiming ownership is tantamount to declaring indifference, and thus negates the existence of any privacy concern in a container's contents. See Miller, 589 F.2d ___ ______ at 1131. C. Inevitable Discovery. C. Inevitable Discovery. ____________________ Even if the defendant's consent were somehow tainted, and the search invalid, suppression would not lie in this instance for the contraband inevitably would have been discovered. Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, see Nix v. Williams, ___ ___ ________ 467 U.S. 431, 448 (1984); Infante-Ruiz, ___ F.3d at ___ [slip op. ____________ at 10], so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment. See United States v. ___ _____________  ____________________ 5We note that this principle is totally consistent with the precept that ownership and a subjective expectation of privacy are among the key factors that trigger the right to privacy. See ___ Aguirre, 839 F.2d at 856-57 (citing other cases). _______ 15 Silvestri, 787 F.2d 736, 744 (1st Cir. 1986), cert. denied, 487 _________ _____ ______ U.S. 1233 (1988). In this case, all the relevant criteria are satisfied. The record establishes unequivocally that the car containing the contraband was unregistered and uninsured. Because the car could not lawfully be driven on a public highway, see supra note 2, the ___ _____ state police surely would have impounded it and, in accordance with standard practice, conducted a routine inventory search.6 In the process, the two large bags of cocaine in the vehicle's trunk would certainly have come to light. Courts have regularly approved inventory searches of impounded motor vehicles despite the absence of probable cause, see, e.g., Colorado v. Bertine, ___ ____ ________ _______ 479 U.S. 367, 371 (1987); United States v. Ramos-Morales, 981 ______________ _____________ F.2d 625, 626 (1st Cir. 1992) (collecting cases), cert. denied, _____ ______ 113 S. Ct. 2384 (1993); United States v. Rodriguez-Morales, 929 _____________ _________________ F.2d 780, 785 (1st Cir. 1991), cert. denied, 112 S. Ct. 868 _____ ______ (1992); United States v. Trullo, 790 F.2d 205, 206 (1st Cir. _____________ ______ 1986), and, by like token, courts often have held that evidence which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule, see, e.g., United ___ ____ ______  ____________________ 6An inventory search is a wholly independent legal procedure serving legitimate governmental ends and circumscribed by standardized rules. See Colorado v. Bertine, 479 U.S. 367, 372- ___ ________ _______ 76 (1987). Here, pursuit of that means was ongoing, in the sense that, by the time of the search, the authorities had already secured the critical information concerning the car. The fact that legal means of discovery are underway at the time an unlawful search transpires is highly relevant to, though not a requisite of, the inevitable discovery inquiry. See Silvestri, ___ _________ 787 F.2d at 746. 16 States v. Seals, 987 F.2d 1102, 1107-08 (5th Cir.), cert. denied, ______ _____ _____ ______ 114 S. Ct. 155 (1993); United States v. Horn, 970 F.2d 728, 732 _____________ ____ (10th Cir. 1992); United States v. Williams, 936 F.2d 1243, 1248- _____________ ________ 49 (11th Cir. 1991), cert. denied, 112 S. Ct. 1279 (1992); United _____ ______ ______ States v. Mancera-Londono, 912 F.2d 373, 375-76 (9th Cir. 1990); ______ _______________ United States v. Arango, 879 F.2d 1501, 1507 n.2 (7th Cir. 1989), _____________ ______ cert. denied, 493 U.S. 1069 (1990); see also United States v. _____ ______ ___ ____ _____________ George, 971 F.2d 1113, 1121 (4th Cir. 1992) (agreeing in theory); ______ United States v. Jenkins, 876 F.2d 1085, 1088 (2d Cir. 1989) ______________ _______ (same). At least one court has so ruled under circumstances hauntingly reminiscent of the circumstances at hand. See People ___ ______ v. Nelson, 486 N.Y.S.2d 979, 983-84 (N.Y. Sup. Ct. 1985) (holding ______ discovery of evidence inevitable because police had a right to impound, and conduct an inventory search of, an apparently unregistered, uninspected, and uninsured vehicle driven on a public highway). We discern no valid reason why the same result should not obtain in this case.7  ____________________ 7We decline to embrace the suggestion that courts should confine the inevitable discovery rule to cases in which the disputed evidence comprises a derivative, rather than primary, fruit of unlawful police conduct. See United States v. $639, 558 ___ _____________ _________ in United States Currency, 955 F.2d 712, 718-21 (D.C. Cir. 1992). _________________________ Although the Nix case involved derivative evidence, we regard its ___ rationale that the exclusion of inevitably discovered evidence would "put the government in a worse position" than if no illegality had occurred, Nix, 467 U.S. at 443 to be fully ___ applicable to cases involving primary evidence. And we are thrice fortified in this conclusion: by the Nix Court's ___ approving citation to cases that had applied the rule in the context of primary evidence, see id. at 440 n.2 (citing, inter ___ ___ _____ alia, United States v. Apker, 705 F.2d 293 (8th Cir. 1983); ____ ______________ _____ United States v. Romero, 692 F.2d 699 (10th Cir. 1982); and ______________ ______ United States v. Roper, 681 F.2d 1354 (11th Cir. 1982)); by the _____________ _____ Court's subsequent endorsement of the closely related 17 D. The Confession. D. The Confession. ______________ Although appellant challenges the district court's refusal to suppress his confession, he bases his challenge on the taint arising from the claimed shortcomings in the initial encounter and vehicle search. Because the red flag of constitutional infirmity does not fly from these ramparts the investigatory stop, the search, and the ensuing arrest all pass constitutional muster and because the requisite Miranda _______ protections were scrupulously observed, the court below appropriately declined to quarantine appellant's confession. V. CONCLUSION V. CONCLUSION We need go no further. No reversible error appearing, the judgment of conviction must be Affirmed. Affirmed. ________  ____________________ "independent source" rule in a case involving primary evidence, see Murray v. United States, 487 U.S. 533, 540-41 (1988); and by ___ ______ _____________ the fact that no fewer than seven other circuits have approved application of the inevitable discovery rule in primary evidence cases, see cases cited supra p.16. ___ _____ 18