United States Court of Appeals
 For the First Circuit

No. 98-2302

 UNITED STATES,

 Appellee,

 v.

 KEITH FORBES,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ernest C. Torres, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Stahl and Lynch, Circuit Judges.

 David N. Cicilline for appellant.
 Kenneth P. Madden, Assistant United States Attorney, with whom
Margaret E. Curran, United States Attorney, was on brief, for
appellee.

May 24, 1999

 STAHL, Circuit Judge. Defendant-appellant Keith Forbes
appeals his convictions for possession of cocaine with intent to
distribute and possession of marijuana with intent to distribute,
both in violation of 21 U.S.C. 841. He claims that the court
erred in denying his motion to suppress evidence seized during a
warrantless search of his automobile. We vacate the order denying
the motion to suppress and remand for further proceedings.
 I.
After a warrantless search of his automobile, Forbes, a
Jamaican immigrant, was arrested and charged with two counts of
violating 21 U.S.C. 841(a)(1) and (b)(1). During a hearing on
July 2, 1998, the district court denied Forbes's motion to suppress
evidence derived from the search. Forbes pleaded guilty to the two
counts, but reserved the right to appeal the court's order denying
his motion to suppress. The court sentenced Forbes to, inter alia,
57 months' imprisonment.
Because the facts are in dispute, and because this appeal
largely turns on whether the court made improper factual findings,
we recite both the government's and Forbes's versions of the facts
as they emerged during the suppression hearing, followed by the
court's findings.
 A. The Government's Version
Rhode Island State Trooper Terrence Pendergast, the
officer who conducted the search in question, testified as follows. 
On April 1, 1998, Forbes was driving a black BMW with Massachusetts
plates and tinted windows northbound on Route 95 near West
Greenwich, Rhode Island. Pendergast clocked Forbes driving
seventy-five miles per hour in a sixty-five miles per hour zone. 
After noting that Forbes was speeding, Pendergast followed directly
behind Forbes in a marked police car without turning on his lights
or siren. Forbes then began shifting from lane to lane without
putting on his turn signal. At this point, Pendergast put on his
lights and pulled Forbes over.
 Pendergast walked to the car, and Forbes lowered the
driver's side window. Pendergast saw smoke coming from the window
and smelled burning marijuana. When he asked Forbes if he had any
more marijuana in his possession, Forbes replied, "No. I don't
have any more marijuana. I had just finished smoking a roach." 
Pendergast took Forbes's license and registration, and ran a
criminal history check on them. The check showed Forbes's papers
to be valid and did not reveal that Forbes had a criminal record,
but Pendergast nonetheless retained the documents. 
Pendergast next asked Forbes if he would consent to a
search of the vehicle, and Forbes acquiesced. Although Pendergast
had written consent forms in his cruiser, he did not give Forbes
one. Pendergast did not think he needed written consent, or for
that matter, any consent, because he believed he had probable cause
to search the vehicle anyway. 
Pendergast asked Forbes to step out of the car, did a
Terry frisk of his person, and removed a pack of rolling papers and
a wallet from his pockets. After another officer arrived,
Pendergast searched Forbes's vehicle. Pendergast saw what appeared
to be at least a dozen marijuana seeds in the ashtray.
Pendergast then asked Forbes how to open the trunk, and
Forbes replied that you need to use the car key. Pendergast
removed the key from the car, handed Forbes the key, and asked him
to open the trunk. Forbes willingly did so. Within the trunk were
two zipped duffel bags, which smelled of unburned marijuana and
acetone. Pendergast unzipped and searched the bags. The first
duffel bag contained cocaine. After finding the cocaine,
Pendergast handcuffed Forbes and read him his Miranda rights. 
Pendergast then opened the second duffel bag, which contained
marijuana. Pendergast drove Forbes back to the police station.
 B. Forbes's Version
Forbes's version of the events in question is decidedly
different. Forbes was not driving seventy-five miles per hour; he
knew that the overpass where Pendergast was waiting was a common
speed trap, so he was careful at that section of the highway. Nor
did Forbes swerve from lane to lane; he only changed from the right
lane to the left lane once. After being pulled over, Forbes asked
Pendergast why he had been stopped, and Pendergast replied that his
windows were too dark. 
Pendergast initially asked Forbes for his license and
registration. Pendergast took the papers to check them and,
returning to the car, asked Forbes to step out of the car. 
Pendergast frisked Forbes, and then asked him whether he had any
drugs or weapons. Forbes answered, "No." Forbes did not ever
smoke marijuana in the car and had not smoked marijuana that day. 
He had, however, smoked a cigar in the car that morning, and there
was an empty cigar packet on the floor of the car. 
Pendergast then told Forbes to wait in his car, and
Pendergast returned to his cruiser. A second police car arrived. 
Pendergast told Forbes to back up his car, leave his key in the
ignition, and again step out of the car. Pendergast searched
Forbes's pockets (removing the wallet and the rolling papers), and
subsequently began to search Forbes's car without asking for, or
receiving, consent. Forbes testified that he never would have
consented to a search of the car, because he knew that there were
drugs in the trunk. After completing his search of the car,
Pendergast took Forbes's key and opened the trunk. 
Supporting Forbes's version of events, a laboratory test
performed on the contents of Forbes's ashtray revealed no traces of
drugs. Nor did there appear to be "seeds" of any kind in the
ashtray; the toxicologist's report made no reference to seeds, and
Pendergast admitted during the hearing that he could not discern
any seeds in the toxicologist's exhibit, which was taken from the
ashtray. 
 C. The District Court's Findings
In making its findings, the district court explicitly
stated that 
 if I was just looking at a cold record here, I
wouldn't believe the Government's
version . . . . But I must say after listening
to the testimony of Trooper Pendergast, and
observing him when he testified, the version
as difficult as it may seem to believe on
paper, seems to me to be credible as related
by him.

The court believed that Pendergast "smelled what he thought was
burning marijuana," though the smell may not have actually been
marijuana. Similarly, the court stated that, although "based on
the evidence that's been presented, there probably were not
marijuana seeds in the ash tray[,] [t]hat doesn't mean that Trooper
Pendergast might not have thought he saw them." The court also
found that it was Forbes who opened the trunk of the car. Most
importantly for present purposes, the court determined that Forbes
voluntarily gave his consent to the search. 
Yet despite the court's contention that it found
Pendergast to be credible, the court rejected some major parts of
Pendergast's testimony. It found that Forbes was speeding, but
that Pendergast's claim that he was swerving from lane to lane was
"probably a little window-dressing." Moreover, the court found
that when asked if there was marijuana in the vehicle, Forbes
simply answered, "No." The court thus rejected Pendergast's
"roach" testimony. 
On appeal, Forbes argues that the district court erred in 
its determination that he gave valid consent to the warrantless
search of his automobile. The government counters that there was
no error and also contends that, even if the court did err in
finding valid consent, there was probable cause to support a search
of the vehicle without consent.
 II.
A warrantless search violates the Fourth Amendment unless
it comes within one of the "few specifically established and well-
delineated exceptions" to the warrant requirement. Schneckloth v.
Bustamonte, 412 U.S. 218, 219 (1973). A consensual search is one
such exception. See id. To establish applicability of the consent
exception, the government must prove valid consent by a
preponderance of the evidence. See United States v. Schaefer, 87
F.3d 562, 569 (1st Cir. 1996).
Forbes makes three alternative arguments as to why the
court erred in finding valid consent: (1) the facts, as found by
the district court, do not support the conclusion that Forbes's
consent to search was voluntary; (2) even if his consent to search
the car was voluntary, Forbes did not consent to a search of the
bags in the trunk; or (3) the court erred in its factual finding
that Forbes consented to the search at all. We will address each
argument in turn. 
 A.
First, Forbes contends that even if we were to assume
that the facts as found by the district court are supportable, the
court erred in its ultimate conclusion that Forbes's consent was
voluntary. See Ohio v. Robinette, 519 U.S. 33, 40 (1996) (stating
that, to be valid, consent to a search must be voluntary). The
determination of voluntariness "turns on an assessment of the
totality of the circumstances." United States v. Barnett, 989 F.2d
546, 554-55 (1st Cir. 1993). The court should take into account
factors such as the consenting party's "age, education, experience,
intelligence, and knowledge of the right to withhold consent." Id.
at 555. Further considerations "include whether the consenting
party was advised of his or her constitutional rights and whether
permission to search was obtained by coercive means or under
inherently coercive circumstances." Id. We review a determination
that consent was voluntary for clear error. See id. at 556.
Forbes points to several factors that weigh against a
finding of voluntary consent: (1) there was no written consent; (2)
Forbes was not advised of his right to refuse consent; (3) he was
not free to leave (as Pendergast retained possession of his license
and registration); and (4) as a native of Jamaica, Forbes may have
had little knowledge of the extent of his rights. In contrast,
weighing in favor of the court's finding of voluntariness are the
facts that (1) there was only one officer present at the time
Forbes's consent was sought; (2) Pendergast did not show his gun to
Forbes; (3) Forbes was not handcuffed; (4) Forbes was not yet
arrested and was not in a custodial setting; and (5) the district
court found that Forbes was willing and very cooperative. Cf. id.
at 555-56 (consent was voluntary even though defendant was met at
the door of his home by seven or eight law enforcement officers
with guns drawn, was arrested and handcuffed, and was not informed
that he could withhold consent). Furthermore, there was no showing
that Forbes's foreign background made him unfamiliar with his legal
rights; on the contrary, his criminal record, see supra note 1,
indicates that he had previous dealings with law enforcement
officers.
If we assume arguendo that the district court's factual
findings are supportable, it would be difficult to rule that the
district court clearly erred in determining that Forbes's consent
was voluntary. In a very similar situation, the Supreme Court
determined that the defendant made an "essentially free and
unconstrained choice because his will ha[d] [not] been overborne
and his capacity for self-determination [was not] critically
impaired." United States v. Watson, 423 U.S. 411, 424 (1976)
(first alteration in original) (citation and internal quotation
marks omitted). In Watson, the Court found it significant that
there was no overt act or threat of force, no promises made to the
defendant, and no "subtle form[] of coercion that might flaw his
judgment." Id. Although the defendant "had been arrested and was
in custody," he gave his consent "while on a public street, not in
the confines of a police station." Id. The Court emphasized that
the fact of custody alone is never enough to demonstrate coerced
consent. See id. Furthermore, the Court was not persuaded by the
fact that there was an absence of proof that the defendant knew he
could withhold his consent; the Court stated that while this is a
factor, it does not have controlling significance. See id. The
Court concluded: 
 There is no indication in this record that
[the defendant] was a newcomer to the law,
mentally deficient, or unable in the face of a
custodial arrest to exercise a free choice. 
He was given Miranda warnings and was further
cautioned that the results of the search of
his car could be used against him. He
persisted in his consent.

Id. at 424-25 (footnote omitted).
The only differences between the present case and Watson
are that Forbes was not arrested, was not given Miranda warnings,
and was not told that the results of the search could be used
against him. Though the last difference is an important one, we
think it significant that Forbes's own testimony indicates that he
knew that the search could be used against him. Specifically, he
stated that he would not have consented to a search because he knew
that there were drugs in the car. Therefore, we believe that this
case is ultimately indistinguishable from Watson. Thus, if we
assume the correctness of the court's finding that consent existed,
but see infra Part II.C., we could not say that the court was
clearly erroneous in determining that such consent was voluntary.
 B. 
Forbes also argues that even if he consented to a search
of the car, he did not voluntarily consent to a search of the
zipped bags in the trunk. The relevant inquiry is "what would the
typical reasonable person have understood by the exchange between
the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251
(1991). Assuming again that the court's factfinding was correct,
it is reasonable to construe Forbes's consent to search the
automobile as encompassing consent to search the trunk. See United
States v. Zapata, 18 F.3d 971, 977-78 (1st Cir. 1994)
("[A]ppellant's general consent to a search of the automobile
constitute[s] consent to a search of the [unzipped] duffel bags [in
the trunk]."). Moreover, the court found that Forbes opened the
trunk for Pendergast, thereby reiterating his agreement to search
the trunk. Cf. United States v. Miller, 589 F.2d 1117, 1131 (1st
Cir. 1978) (unlocking a vehicle may itself be enough to support an
inference of consent). Therefore, if Forbes consented to a search
of the car, he also consented to a search of the trunk. A
reasonable person also would expect that a general consent to
search a vehicle, including the trunk, would extend to duffel bags
within that vehicle or trunk. Cf. Zapata, 18 F.3d at 977 ("[A]
general consent to search a motor vehicle subsumes the specific
consent to search any easily accessible containers within the
vehicle."). But even if consent did not extend to the duffel bags,
Pendergast's uncontested testimony that the bags smelled of
unburned marijuana and acetone would give him probable cause to
search the bags. See United States v. Staula, 80 F.3d 596, 602
(1st Cir. 1996) (olfactory evidence may furnish a law enforcement
officer with probable cause to search a confined area). Thus, if
Forbes consented to a search of his car, the search of the duffel
bags in his trunk was proper. 
 C.
Finally, Forbes argues that the district court erred in
its factual finding that he consented to a search of his vehicle. 
Although we also review for clear error the district court's
finding that there was a consent-in-fact to search, see Miller, 589
F.2d at 1130, our review is more deferential when it comes to the
court's findings of historical facts, which depend upon assessments
of witness credibility. Fed. R. Crim. P. 52(a) demands particular
deference to determinations regarding witness credibility, because
only the trial court can judge a witness's demeanor or tone of
voice. See Anderson v. Bessemer City, 470 U.S. 564, 575 (1985). 
Nonetheless, 
 [t]his is not to suggest that the trial judge
may insulate his findings from review by
denominating them credibility determinations,
for factors other than demeanor and inflection
go into the decision whether or not to believe
a witness. Documents or objective evidence
may contradict the witness' story; or the
story itself may be so internally inconsistent
or implausible on its face that a reasonable
factfinder would not credit it. Where such
factors are present, the court of appeals may
well find clear error even in a finding
purportedly based on a credibility
determination.

Id.
Here, the court's findings are indeed troubling. We do
not wish to substitute our judgment for that of the district court,
but we are concerned that this is a case where an affirmance
without further record development would endorse the very
insulation warned against in Anderson. The government had the
burden of proof: it needed to show consent by a preponderance of
the evidence. Yet the court itself stated that the government's
version of events looked improbable on the record. As the court
acknowledged, it would seem unlikely that Forbes, an individual not
unfamiliar with the criminal justice system, would consent to the
search of an automobile that he knew to contain drugs. The court
therefore rested its findings solely on the credibility of
Pendergast. Such credibility is questionable after the court's own
determination that some of the officer's testimony was false or
"window-dressing." The court did not explain why it found
Pendergast to be credible on the consent issue but incredible on
the issue of Forbes's alleged admission about smoking the roach or
the swerving from lane to lane. We emphasize that Pendergast's
testimony is not entitled to increased deference merely because he
is a police officer. Cf. United States v. Victoria-Peguero, 920
F.2d 77, 84 (1st Cir. 1990) ("Where government agents are apt to be
key witnesses, the trial court . . . should ordinarily make inquiry
into whether prospective jurors are inclined to have greater faith
in the agents' testimony merely by virtue of their official
positions."). 
Moreover, there is evidence that would tend to contradict
Pendergast's testimony with respect to Forbes's consent. 
Pendergast failed to use the written consent forms which he had. 
Furthermore, Pendergast gave no explanation as to why he asked for
Forbes's consent at all, given that he did not believe consent was
necessary. And physical evidence presented at the hearing the
contents of Forbes's ashtray tends to contradict Pendergast's
story on another crucial point: whether he saw any marijuana seeds
in Forbes's ashtray. Without further explanation as to why
Pendergast's testimony with respect to consent is sufficient to
meet the government's burden, despite the improbability of
Pendergast's story, the indications that Pendergast was an
unreliable witness in other respects, and the fact that extrinsic
evidence tends to call into question his testimony, we would have
a "definite and firm conviction that a mistake has been committed." 
Interstate Commerce Comm'n v. Holmes Transp., Inc., 983 F.2d 1122,
1129 (1st Cir. 1993) (stating that such a conviction is reason to
find clear error). Because we find ourselves without a sufficient
explanation for the court's ultimate conclusion, we are uncertain
whether a mistake has been committed. We therefore remand to the
district court so that it may clarify and amplify the reasons for
its factual findings or, perhaps, reconsider its conclusion. 
 III.
The government argues that even if the district court
erred on the issue of consent, we should nonetheless affirm the
conviction because Pendergast had probable cause to search the
automobile. The district court, however, never considered the
government's probable cause argument and therefore made no factual
findings on the issue. Moreover, the record as it stands does not
compel a finding of probable cause. Therefore, we cannot affirm on
this basis. If the court below should determine that it erred on
the issue of consent, it should then make the necessary findings
regarding probable cause. 
 IV.
Accordingly, we vacate the order denying the motion to
suppress evidence and remand to the district court for further
proceedings consistent with this opinion.