# United States Court of Appeals
# For the First Circuit

No. 02-2698

UNITED STATES OF AMERICA,

Appellant,

v.

LAWRENCE F. MAGUIRE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Schwarzer,[*] Senior District Judge.

Cynthia A. Young, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, were on brief, for appellant.
Albert F. Cullen, Jr., for appellee.

March 3, 2004

---

[*] Of the Northern District of California, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>. Defendant Lawrence T. Maguire ("Maguire") was arrested by the Medford Police Department ("MPD") on September 7, 2001. He was indicted on one count of bank robbery, in violation of 18 U.S.C. § 2113(a). He filed a motion to suppress arguing that his arrest was unlawful. He further argued that, as a result of the unlawful arrest, statements made to the police and physical evidence obtained by them should be suppressed. The district court held an evidentiary hearing on Maguire's motion, which was subsequently granted in part. <u>United States</u> v. <u>Burhoe</u>, Crim. No. 01-10464-RCL (D. Mass. Nov. 27, 2002).[1] The government filed an interlocutory appeal, pursuant to 18 U.S.C. § 3731, arguing that the officers engaged in a valid investigatory stop. We conclude that the district court's decision was in error, and thus, we reverse.

**I.**

On September 7, 2001, at approximately 10:19 a.m., the MPD radio dispatcher broadcast to all police units information regarding an armed robbery that had occurred at the Citizen's Bank inside the Shaw's Supermarket on Locust Street in Medford, Massachusetts around 10:00 a.m. The dispatcher stated that the robbery had been committed using a knife and that the two male robbers had used a black getaway vehicle with Massachusetts registration number 9936RT. The vehicle had turned left out of a

---

[1] Burhoe, Maguire's co-defendant, is not a party to this appeal.

-2-

parking lot located on Locust Street and was, according to the police radio report, headed towards Riverside Avenue.

After the initial dispatches were reported over radio broadcast, MPD Officer Sheila Quinn ("Quinn") reported that she was in pursuit of a black car on Riverside Avenue. By this time, the police knew that the car had been stolen. Quinn said over the radio that there were two white males inside the car. The car was reported to have crossed the Fellsway and Middlesex Avenue, gone down Fifth Street and turned left. The vehicle was abandoned in the vicinity of the Osgood School on Fourth Street, and the occupants fled on foot.

Lieutenant Michael Goulding ("Goulding") was on duty at the time of the initial broadcast regarding the armed robbery. He left the station in an unmarked police car accompanied by Detective Robert Scully ("Scully"). They drove towards the reported location of the getaway car. When they arrived at Fourth Street and Middlesex Avenue, they heard over the radio that the suspects had abandoned the car in front of the Osgood School. The suspects were reported to be on foot, and according to the radio broadcast, one suspect was heading towards the Fellsway.

Goulding and Scully, in plain clothes, parked their unmarked car near 112 Second Street. The officers wanted to position themselves along the likely escape route of the suspects. Second Street was empty at the time, as most of the police cruisers

-3-

were already parked on Fourth Street near the Osgood School. Shortly after parking on Second Street, Goulding saw a white man, later identified as defendant Maguire, emerge from a backyard on Second Street, apparently coming out of a private residential property. Maguire appeared disheveled, unkempt and confused, and he had scratches on his face and hands. He also appeared to be wearing several layers of clothing on what was described as a very warm and sunny day.

The accounts diverge at this point. According to Goulding's account, after stepping out of the vehicle, Goulding and Scully approached Maguire, who continued to walk at a steady pace.[2] The officers began speaking with Maguire, and Goulding asked Maguire if he was from the area. According to Goulding, Maguire was not responsive and appeared dazed. When asked how he was doing, defendant responded "Huh?" Eventually, Maguire informed the officers that he was from Malden, not Medford, which is approximately half a mile away.[3] Goulding testified that, up to this point, neither he nor Scully had restrained Maguire in any way.

---

[2] Scully's badge was displayed.

[3] A report prepared by MPD Detective Michael Fahey, who arrested Maguire's co-defendant, said that Maguire did not acknowledge the officers and continued to walk past them. Goulding testified that although Maguire continued walking during the encounter, he did acknowledge the officers' presence and answered their questions.

-4-

Goulding asserts that while speaking to Maguire, someone suddenly yelled "Get your hands up!" MPD Officer Richard Dorrance ("Dorrance") was standing on the other side of Maguire with his gun drawn, yelling at him. Goulding testified that Maguire raised his hands, which revealed a knife protruding from his waistband at the small of his back. Goulding testified that he turned his attention from Dorrance to Maguire after assuring himself that Dorrance was a fellow officer. Maguire raised his hands, which enabled Goulding to see a black-handled object protruding from the waistband of Maguire's pants. Goulding recognized the object as a knife. He then proceeded to grab Maguire's arm, and with Scully's assistance, put Maguire on the ground. Goulding and Scully pulled a large kitchen-style knife out of the back of Maguire's pants and threw it to the side. To determine if Maguire had any other weapons, they grabbed anything that was loose on the suspect, which included a gray shirt, a blue shirt and a towel, which were put to the side. Goulding also tossed aside a white baseball cap that had fallen off Maguire's head. He testified that he did not see the knife until Maguire raised his arms. Goulding did not file a written report of his activities on September 7, 2001.

Officer Dorrance's account differs from Goulding's in some respects. Dorrance was on duty in a marked cruiser when the initial report of the armed robbery came over the police radio. Dorrance followed Quinn as she pursued the suspects in the black

car, but he began a separate area search when he heard the suspects had abandoned their car in front of the Osgood School. Dorrance then arrived on Second Street, where he heard the officers speaking to Maguire. According to Dorrance, Maguire was not responsive to the officers' questions, and kept on walking. Dorrance passed them in his cruiser, parked ahead of them and got out of the car.

Dorrance testified that, at that moment, Maguire turned to face the officers and immediately put one hand, and then a second hand, behind his back, lifted his coat and attempted to get something out of his waistband. Dorrance drew his weapon and told Maguire to get on the ground, because he knew from the radio reports that one of the robbery suspects had been armed with a knife, and he was concerned that Maguire might have been reaching for a weapon. Dorrance testified that Maguire ignored his order, but seconds later Goulding and Scully had each grabbed one of Maguire's arms and removed the knife. Finally, Dorrance testified that Maguire was pat-frisked for other weapons.

Scully filed an arrest report, which differs in some respects from both Goulding's and Dorrance's versions of events.[4] Scully wrote that when he and Goulding approached Maguire, "[h]e appeared to have a black handled item stuffed down the back of his pants." He further stated that he called for Maguire to stop, and eventually Goulding and Scully ordered Maguire to the ground and

---

[4] Scully died before he could testify at the evidentiary hearing.

disarmed him.  Dorrance had arrived to assist them, and the suspect was subsequently handcuffed and read his rights.  As the district court noted, there was no mention of the conversation between Maguire and Goulding, but Scully mentioned calling for Maguire to stop.[5]  Either Goulding or Scully advised Maguire of his rights and placed him under arrest, and he was taken to the police station by Dorrance.

Maguire moved to suppress the evidence obtained by the police as a result of the stop and search.  Maguire also moved to suppress statements made at the time of his arrest and the physical evidence that resulted from the stop and subsequent arrest.[6]  The district court held an evidentiary hearing and heard argument on the motion to suppress.  The district court granted the motion to suppress Maguire's statements to the police and the physical evidence found as a result of the stop.  It held that Maguire was de facto arrested at the moment Goulding and Scully held him and

---

[5]  The district court also examined a report filed by Medford Police Officer Michael Fahey.  Fahey was the officer who arrested Maguire's co-defendant.  He filed a report which, in the district court's estimation, contradicted the account of the other officers. We discuss the reasons why Fahey's testimony is not relevant in footnote 8.

[6]  The physical evidence that Maguire sought to be suppressed included: (1) $392.00 in United States currency; (2) a key; (3) a fingernail clipper; (4) a white towel; (5) a gray sweatshirt; (6) a blue shirt; (7) a white baseball cap; (8) a black-handled knife; and (9) a pair of sneakers.

put him on the ground and that the government had failed to establish probable cause for such an arrest.

## II.

We review the district court's factual findings for clear error and its legal conclusions de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Trueber, 238 F.3d 79, 91 (1st Cir. 2001). "Determinations of . . . reasonable suspicion, relevant to the constitutionality of law enforcement seizures and arrests under the Fourth Amendment, present mixed questions of law and fact which we review de novo." United States v. Young, 105 F.3d 1, 5 (1st Cir. 1997)(citing Ornelas, 517 U.S. at 699).

The district court concluded, based on the facts described above, that Maguire was de facto arrested when Goulding and Scully took hold of him and put him on the ground. The government disagrees, arguing that the officers were engaged in a investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968).

Terry held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id. at 22. To withstand scrutiny, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" United States v. Sokolow, 490 U.S. 1, 7 (1989)(quoting Terry, 392 U.S. at 27)(internal quotations omitted). In evaluating

the validity of a Terry stop, we consider the totality of the circumstances, mindful that "[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." Id. at 7-8 (internal citation and quotations omitted).

In evaluating whether there was reasonable suspicion, "we first determine whether the officer[s'] actions were justified at [their] inception, and if so whether the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." Trueber, 238 F.3d at 92 (alterations in original) (internal citations and quotations omitted). The first part of the inquiry is satisfied if the officers can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted. Sokolow, 490 U.S. at 7 (citing United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)).

The stop of Maguire was appropriate and reasonable at its inception.[7] Examining the circumstances leading up to the stop of Maguire, we recount the relevant facts Goulding and Scully knew or

---

[7] There is no discussion in the district court's opinion of whether the initial stop of Maguire was reasonable at its inception because the district court held that the seizure was a de facto arrest and did not engage in the Terry inquiry.

could have reasonably inferred when they initially stopped Maguire. First, the officers knew that an armed robbery had been committed in Malden by two white males. In addition, they had a fairly small area to cover given that the officers knew the stolen black getaway car was found abandoned and crashed, in the vicinity of the Osgood School. Maguire, a white male, was encountered two blocks from the Osgood School. Second, he was seen emerging from a residential backyard during mid-morning, but acknowledged to the officers that he was not from the neighborhood. Third, his appearance was inappropriate for the weather: it was a warm, sunny day and Maguire wore many layers of clothing. Further, his appearance was disheveled, and he appeared to have scratches on his body. Finally, Maguire's responses were less than forthcoming, and he was walking away from the officers. See United States v. McCarthy, 77 F.3d, 522, 531 (1st Cir. 1996)(finding that providing vague and evasive responses to officers' questions is relevant in evaluating the propriety of a Terry stop). Even before the officers observed the knife, they had a reasonable and articulable suspicion to warrant stopping Maguire and asking him questions "likely to confirm or dispel their suspicions quickly." United States v. Sharpe, 470 U.S. 675, 686 (1985).

The second inquiry is whether the scope of the investigatory stop was reasonable under the circumstances. Trueber, 238 F.3d at 92. "There is no scientifically precise

-10-

formula that enables courts to distinguish between investigatory stops . . . and . . . 'de facto arrests.'" United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994); see also United States v. Quinn, 815 F.2d 153, 156-62 (1st Cir. 1987).

"An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different." Terry, 392 U.S. at 26. To be sure, Maguire was seized when he was physically restrained by the officers. The appropriate legal determination to be made in this case is whether the seizure exceeded the scope of a permissible Terry stop. See Trueber, 238 F.3d at 92-93 (stating that the "central issue is whether an otherwise valid Terry stop escalated into a de facto arrest"). In cases regarding the scope of a Terry stop, we examine "whether there was 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Id. at 93 (quoting Thompson v. Keohane, 516 U.S. 99 (1995)). To determine whether this type of restraint existed, a court must examine all the circumstances attendant to the restraint. United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996). "This test is objective only: the relevant inquiry is how a reasonable [person] in the suspect's shoes would have understood [the] situation. The subjective beliefs held by the interrogating officers or the person

being interrogated are not germane." Id. (internal quotations and citations omitted).

The district court committed an error of law when it ruled that Maguire had been de facto arrested by Goulding and Scully at the time he was wrestled to the ground, partly because it focused on the discrete moment when Maguire was wrestled to the ground, without considering the totality of the circumstances, as we will do.[8] We explain, focusing on the two arguably coercive factors: the drawn weapon and the physical contact.

Dorrance's use of his weapon when he encountered Maguire was permissible during an investigatory stop. It is well established that the use or display of a weapon does not alone turn an investigatory stop into a de facto arrest. See Trueber, 238 F.3d at 94; see also United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987). In addition, Officer Dorrance drew his weapon for a very short time. See United States v. Taylor, 162 F.3d at 21 (holding that a valid Terry stop did not become a de facto arrest when two officers drew their weapons after they had stopped a vehicle).

In examining the physical contact element, the district court relied heavily on Young, 105 F.3d 1, and Zapata, 18 F.3d 971.

---

[8] To the extent that the district court believed that it had to reconcile the officers' testimonies, we believe this may have been improvident, especially when the officers all agree that Maguire was not put on the ground until the knife was observed.

-12-

In those cases, we held that the police officers engaged in valid Terry stops. In Young, the officers observed three individuals who appeared to match the description of the armed robbers sought. When the officers approached the suspects, Young walked away and was observed with a gun in his waistband. Young, 105 F.3d at 7. After being pursued by the officers, the officers brushed Young's hand. We held that this type of physical contact did not convert the stop into a de facto arrest. Id. at 8. In Zapata, we similarly held that touching by a police officer did not transform a Terry stop into a de facto arrest. Zapata, 18 F.3d at 976. Working from the premise that arrests and investigatory touching necessarily carry with it some degree of coercion, we held that slight physical touching cannot, on its own, produce a de facto arrest. Id. at 976-77 (commenting on California v. Hodari D., 499 U.S. 621 (1991)).

In the instant case, there was more than de minimis physical contact. However, merely because physical contact exceeds de minimis contact, it does not necessarily follow that the scope of the Terry stop was exceeded. Physical touching attendant to a Terry stop, particularly when officers are attempting to ensure their own personal safety in a reasonable manner, must be examined in the factual context of the case. After detaining Maguire, the officers were entitled to ask him questions and search him for weapons if they felt their personal safety was threatened. "[A]

-13-

perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody. . . ." Terry, 392 U.S. at 26; see also United States v. Hensley, 469 U.S. 221, 235-36 (holding that the mere use of force does not convert an investigative stop into an arrest). When the officers observed the knife, they were reasonably concerned for their safety. The pat-frisk can be an integral part of a Terry stop, and this occasion is no exception. The fact that Maguire was put on the ground does not imply that there was a de facto arrest. See United States v. Taylor, 162 F.3d 12, 21 (1st Cir. 1998)(holding that officer's action of putting suspects on the ground and searching for weapons was within scope of Terry stop); United States v. Jackson, 918 F.2d 236, 238 (1st Cir. 1990)(holding that the police could, within the scope of a Terry stop, block the suspect's exit from a vehicle to determine whether the suspects were armed). We find that officers Goulding and Scully putting Maguire on the ground to remove the knife did not exceed the scope of the investigative stop. Given the reasonable suspicion that led to the Terry stop, and the fact that the suspicion was heightened during the stop, we cannot say that this physical contact between Maguire and the officers exceeded the bounds of Terry.

Moreover, several other factors counsel against finding that a de facto arrest took place. The stop occurred on a public

street in the light of day.  <u>Trueber</u>, 238 F.3d at 94 (listing the encounter's public setting as a factor to be considered).  Goulding and Scully were in plain clothes.  The encounter between the police officers and Maguire lasted a very short time.  <u>See</u> <u>Sharpe</u>, 470 U.S. at 685 (stating that time is an important factor in determining whether a seizure is justifiable on reasonable suspicion).  Finally, Maguire was not handcuffed or detained in a manner consistent with a formal arrest.  <u>See</u> <u>United States</u> v. <u>Acosta-Colón</u>, 157 F.3d 9, 18 (1st Cir. 1998)(stating "that the use of handcuffs, being one of the most recognizable indicia of traditional arrest, 'substantially aggravates the intrusiveness' of a putative <u>Terry</u> stop.") (citation omitted).

Based on the facts recounted above, and taking into account the totality of the circumstances, a reasonable person in Maguire's position would not have believed he was under arrest, but that he was detained only for an investigatory stop.

**III.**

For the foregoing reasons, we vacate the district court's order and remand to the district court for further proceedings consistent with this opinion.

**<u>Reversed and Remanded</u>**.