2000 ME 9

## MAINE SHIPYARD & MARINE RAILWAY

v.

Daniel G. LILLEY and Annette P. Lilley, Trustees of the Lilley Trust, and Daniel G. Lilley, individually.

Supreme Judicial Court of Maine.

Argued Jan. 5, 2000.

Decided Jan. 21, 2000.

---

Carl W. Tourigny (orally), S. James Levis, Levis & Hull, P.A., Biddeford, Thomas E. Clinton (orally), Clinton & Muzyka, P.C., Boston, MA, for plaintiffs.

**1266**

David J. Perkins (orally), Perkins, Olson & Pratt, P.A., Portland, for defendants.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS.

RUDMAN, J.

[¶ 1] Daniel G. Lilley and Annette P. Lilley, trustees of the Lilley Trust, and Daniel Lilley, individually, appeal from the judgment entered in the Superior Court (Cumberland County, *Mills, J.*) finding Daniel Lilley and the Lilley Trust liable on a claim of unjust enrichment. Lilley asserts that the Superior Court erred when it held him personally liable; that competent evidence did not support the court's award of damages; and that the court erred by admitting evidence concerning the Trust's settlement with the party responsible for the damage to its property. We disagree and affirm the judgment.

## I. FACTS

[¶ 2] Daniel and Annette Lilley are both trustees and beneficiaries of the Lilley Trust, an inter vivos trust. As trustees, they hold title to certain waterfront property in South Portland known as Sunset Marina. This property was damaged by an oil spill in September 1996. A tanker, the *Julie N.*, spilled oil in Portland harbor. After the incident, Daniel Lilley asked George Drivas, the president of Maine Shipyard and Marine Railway (Maine Shipyard), the company that owned the property adjacent to Sunset Marina, if his company could clean the Sunset Marina docks the same way it was going to clean its own docks. Drivas quoted Lilley a charge of $20,000 to clean the docks with a pressure hose, but that did not include repairing the docks. During these negotiations, Lilley never disclosed his status as a trustee or a beneficiary of the Lilley Trust. Rather, he negotiated with Drivas as if he alone were the outright owner of the docks.

[¶ 3] Crawford & Company and the Maritime Oil Corporation (MOC) represented the owners of the *Julie N.* during the clean up process. When they arrived on the scene, together with U.S. Coast Guard officers, to inspect the damage caused by the *Julie N.*, Drivas was informed that the clean up had to be in accord with their procedures and that he could not just wash off the docks as he had planned. At the direction of MOC and Crawford, Maine Shipyard built decontamination pools on its property; dismantled the docks; and moved them to the decontamination area. The shipyard then lifted the docks with a crane into the decontamination pools and began the decontamination process. The decontamination process consisted of placing the float material in special bags, sealing and removing the bags and then washing the floats with a hot sea or high-pressure wash. MOC and Crawford insisted that the Sunset docks be cleaned in the same manner.

[¶ 4] Drivas informed Lilley that the MOC requirements involved much more complicated work than they had originally discussed. Without discussing payment, Lilley instructed Drivas to "go ahead and do what MOC wanted." Lilley told Drivas not to negotiate with Crawford regarding the damage to the Sunset docks because Lilley himself would handle such negotiation. Lilley also requested Drivas clean his seven docks at Portland Pier.

[¶ 5] Maine Shipyard cleaned the docks from October 1996 to January 1997 in the same manner it cleaned its own docks. Unlike Drivas, who made an agreement with Crawford for Crawford to provide material to repair the floats after they were dismantled and cleaned, Lilley did not make such an agreement. Maine Shipyard, therefore, did not have the necessary materials to rebuild Lilley's docks.

After the floats were cleaned, the shipyard picked up the floats by crane and stored them across the street from its property. The shipyard cleaned between 105 and 110 docks.

[¶ 6] Drivas finished the cleaning phase in January 1997. He submitted a bill for $20,000 to Lilley for the hauling and cleaning of the Sunset docks. Drivas waited until Lilley instructed him to repair the docks before Maine Shipyard performed any more work. Lilley sent Drivas a letter instructing Maine Shipyard to repair the docks. Lilley agreed to pay another $20,000 to repair the docks and to negotiate further expenditures. Drivas responded that it would cost more than $20,000 to make the necessary repairs. Lilley then sent a letter to Drivas confirming that he would pay Maine Shipyard the cost of repairing the docks to pre-spill conditions.

[¶ 7] In February 1997, Drivas; his superintendent, Arthur Randall; his attorney, William Kany; Lilley and Lilley's attorney, David Perkins, met to discuss the cost of fixing the docks. Arthur Randall was responsible for providing the materials and labor to repair Sunset's docks. At the meeting, Randall estimated that the labor to repair the docks would cost about $1,000 per dock. Lilley told Drivas to bill Crawford for the work that he performed.

[¶ 8] Following Lilley's instructions, Drivas billed Crawford $115,000 for the cleaning, transport, and storage of 119 floats. Unbeknownst to Drivas, Lilley had previously settled the Trust's claim against the *Julie N.* Drivas learned of this settlement when Crawford returned his bill with a letter explaining that it had already settled with Lilley and Sunset Marina for the hauling and relaunching of the Sunset docks. Drivas then submitted the bill to Lilley. When Lilley failed to respond, Drivas filed a mechanic's lien against the Trust's property. After Drivas filed the lien certificate, Lilley continued to prod Drivas to complete the work.

[¶ 9] Maine Shipyard completed the repairs of the Sunset and Portland docks and billed Lilley $260,456.66 for the work performed at Sunset Marina and $5,400 for the work completed at Portland Pier. Lilley never paid Maine Shipyard for either charge. To perfect its mechanic's lien, Maine Shipyard filed suit and included counts for breach of contract and unjust enrichment in its complaint.[1]

[¶ 10] At trial, over Lilley's objection, the court ruled that evidence of the settlement negotiations between Lilley and the representatives of the *Julie N.* was admissible. A representative of the *Julie N.*, Meredith William Meyers, testified in a video deposition admitted at trial, that the settlement only included the costs of cleaning and repairing the floats and docks at Sunset and that the settlement was determined on a square footage basis. He testified that the Sunset docks were 27,590 square feet and that the insurers of the *Julie N.* settled with Lilley for $17.87 per square foot, including electrical services and material.

[¶ 11] The court found that no contract existed between Lilley and Maine Shipyard and entered a summary judgment on that claim. Lilley's counterclaims were submitted to the jury. Maine Shipyard's mechanic's lien and unjust enrichment claims were decided by the court. The jury found against Lilley and the Lilley Trust. The court dissolved the mechanic's lien finding that the shipyard filed prematurely. The court found the Lilley Trust and Daniel Lilley individually liable for unjust enrichment. The court determined that Lilley did not reveal his trustee status

---

1. Lilley and the Lilley Trust counterclaimed, *inter alia,* against Maine Shipyard for slander of title, slander, negligence, breach of contract and fraud. A jury found in favor of Maine Shipyard on all the counterclaims pertaining to the issue on appeal.

to Drivas. The court also stated that Maine's Probate Code did not "preclude finding Mr. Lilley individually liable on this equity as opposed to contract claim." The court awarded Maine Shipyard $132,-604.75 for unjust enrichment.

[¶ 12] Before the Superior Court determined the damages for the unjust enrichment claim, it heard various trial testimony regarding the cost of cleaning and repairing the docks. Walter Shivik, an expert for Maine Shipyard, testified that the materials and labor necessary to clean and repair the Sunset Marina would cost $223,364. He also testified that Maine Shipyard's charge of $260,000 was reasonable. Another witness, Roger Hale, testified that he estimated the cost of cleaning and repairing to be between $400,000 and $500,000. A defense expert, Charles Poole, estimated that it would cost $35,972 to repair forty-six docks. And as stated above, the superintendent of the Maine Shipyard had estimated that it would cost $1,000 to repair each dock.

[¶ 13] After weighing all the testimony, the court found not credible several of plaintiff and defense witnesses' estimates on damages. Shivik's testimony was based on inaccurate information regarding the number of docks and square footage. Poole's estimates were based on "inaccurate assessments of the scope of that work" and, thus, understated. The court found the testimony of Arthur Randall credible and based its estimation of labor costs on his testimony. The court also relied on Maine Shipyard's invoices for supplies to calculate material costs. Subsequently, Lilley brought this appeal.

**2.** Lilley asserts that the court erred because it found liability pursuant to 18–A M.R.S.A. § 7–306 (1998) and that his conduct does not fall within the statute. The court explicitly found liability on equity not the statute: "The Court concludes that § 7–306 of Maine's Probate Code does not preclude finding Mr. Lilley liable on this equity, as opposed to a contract

## II. INDIVIDUAL LIABILITY

[¶ 14] The court did not err when it held Daniel Lilley jointly liable with the Lilley Trust for unjust enrichment. At common law, the trustee "has full and primary liability." CHARLES E. ROUNDS, JR. & ERIC P. HAYES, LORING: A TRUSTEE'S HANDBOOK § 7.3 (1997) (citing to RESTATEMENT (SECOND) OF TRUSTS § 261 (1959)). A trustee may be personally liable to third parties based upon contract, tort or the trustee's status as legal owner of the trust property.[2] *See* RESTATEMENT (SECOND) OF TRUSTS §§ 248, 261, 265 (1959); *see also* GEORGE GLEASON BOGERT, TRUSTS & TRUSTEES, §§ 712, 731 (2nd ed. 1982 & Supp. 1999) [hereinafter TRUSTS & TRUSTEES].

[¶ 15] Equitable remedies are also available against the trustee. *See Haley v. Palmer*, 107 Me. 311, 315, 78 A. 368, 370 (1910) (applying equitable liability to trustee for debts of beneficiary); TRUSTS & TRUSTEES, § 717 (discussing specific performance against trustee); TRUSTS & TRUSTEES, § 725 (stating that "equity will shape its remedies to meet the facts of each particular situation in order to prevent unjust enrichment.") One equitable remedy available to the court is unjust enrichment. Unjust enrichment is appropriate when "one party unjustly benefits from labor and materials rendered by another with the expectation of payment." *See A.F.A.B., Inc. v. Town of Old Orchard Beach,* 639 A.2d 103, 104 (Me.1994).

[¶ 16] Although the court found no contract between Lilley and Maine Shipyard, Lilley and the Lilley Trust received a benefit from Maine Shipyard without compensation. Thus, unjust enrichment liability is

claim. *See* 18–A M.R.S.A. § 7–306(a) (1998)."

We note certain types of trusts are excluded from the Probate Code's definition of "trust." *See* 18–A M.R.S.A. § 1–201(45) (1998). We do not reach the issue of whether the Lilley Trust is or is not a trust as defined by the Probate Code.

appropriate. Lilley's refusal to pay Maine Shipyard for the work from which he and the Lilley Trust benefitted further affronts equity. Lilley is a beneficiary of the Lilley Trust as well as a trustee. *See Ware v. Gulda,* 331 Mass. 68, 117 N.E.2d 137, 138 (1954) (holding that a person "cannot place his property in trust for his own benefit and keep it beyond the reach of his creditors"). The Superior Court did not err when it found Daniel Lilley liable as an individual for unjust enrichment. A trustee is individually amenable to equitable remedies available under the common law.

## III. DAMAGES

▆▆▆ [¶ 17] Lilley contends that the court's damages award was not supported by competent evidence. We will sustain a damage award provided some evidence exists to support the award. *See VanVoorhees v. Dodge,* 679 A.2d 1077, 1081 (Me. 1996). "Recovery under the doctrine of unjust enrichment is measured by the value of benefits that the plaintiff proves are actually received and retained by the defendant." *A.F.A.B.,* 639 A.2d at 106. The trial court should consider all of the costs of improvements, including the value of the work, labor, services, and materials furnished, when determining the benefit of the value conferred. *See id.*

[¶ 18] Contrary to Lilley's contentions, the Superior Court based its award of damages on competent evidence. When determining the benefit conferred, the court had a duty "to reconcile conflicting testimony, to determine its relative weight, and to determine what part of the testimony is credible and worthy of belief." *State v. Cotton,* 673 A.2d 1317, 1321 (Me.1996). The court found the estimation of damages testimony of several plaintiff and defense witnesses not credible. After considering all the evidence presented, the court found

Arthur Randall's testimony most credible and relied on his estimate of $1,000 per dock as a base for awarding damages. In its order, the court explained that it relied on Randall's testimony because Randall, an employee of Maine Shipyard, gave the estimate after completing three and one-half months of repair work on the docks, but before the relationship between Lilley and Drivas had greatly deteriorated and before Maine Shipyard filed its lien or lawsuit.

[¶ 19] The court also based its materials cost on the total invoices Maine Shipyard presented from its suppliers for materials used to repair the docks. The court properly based the damages on costs of improvements. *A.F.A.B.,* 639 A.2d at 106 (noting that the court should consider the cost of improvements when determining the value of the benefit conferred). The court had a plethora of evidence before it and weighed the evidence as to credibility and determined damages based on the testimony it found most credible. *See Cotton,* 673 A.2d at 1321. This is not error.

## IV. SETTLEMENT DISCUSSIONS

▆▆▆ [¶ 20] Lilley contends that the court should have excluded the evidence of settlement negotiations between Lilley and the representative of the *Julie N.* pursuant to M.R. Evid. 403 and 408. We review evidentiary rulings for clear error and abuse of discretion. *See Kay v. Hanover Ins. Co.,* 677 A.2d 556, 558 (Me.1996).

### A. Rule 403

▆▆▆ [¶ 21] Lilley contends that the admitted settlement evidence was "clearly prejudicial and confirming to the jury." Rule 403 does not allow the court to exclude *any* prejudicial evidence; the evidence must be unfairly prejudicial.[3] *See Saucier v. Allstate Ins. Co.,* 1999 ME 197,

---

**3.** Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

¶ 32, 742 A.2d 482. This settlement evidence did not create an undue tendency to cause the fact finder to decide on an improper basis. The evidence merely provided an estimation of the cost to repair each dock. It was relevant because Maine Shipyard was required to prove the value of the benefit conferred upon Lilley and relevant as to Lilley's estimate of the damage sustained to the Trust's property.

## B. Rule 408

[¶ 22] Lilley also contends that the court committed reversible error by admitting the evidence of settlement negotiations because such evidence is prohibited under Rule 408.[4] We held, in *LeClair v. Commercial Union Ins. Co.*, 679 A.2d 90, 92 (Me.1996), that statements made in negotiations between one party to the suit and a third party are admissible under Rule 408. *See id.* "The rule's policy objective of encouraging out-of-court disposition of disputes between parties is not threatened when settlement evidence is admitted at trial and one of the parties to the agreement is not a party to the present action." *Id.* at 92–93; *Guy Gannett Publishing Co. v. University of Maine*, 555 A.2d 470 (Me.1989) (stating that "Rule 408 in terms bars the admissibility of settlement agreements only on substantive issues in dispute between the parties to the agreement"). Rule 408 did not bar the admission of the settlement evidence because in this case only one party to the litigation was a party to the settlement agreement. *See LeClair*, 679 A.2d at 92; *Gannett*, 555 A.2d at 472–73. Thus, the

court properly admitted the evidence regarding Lilley's settlement negotiations with the representatives of the *Julie N.*

The entry is:

Judgment affirmed.

---

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.
M.R. Evid. 403.

4. Rule 408 states:
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromise or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations or in mediation is also not admissible on any substantive issue in dispute between the parties.
*M.R. Evid. 408.*