2000 ME 97

**STATE of Maine**

v.

**Thomas ST. YVES.**

Supreme Judicial Court of Maine.

Argued April 4, 2000.
Decided May 24, 2000.

---

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Lisa P. Marchese, Asst. Attorney General, Augusta, for State.

Julio DeSanctis III, Laurie Ann Miller (orally), Downeast Law Offices, P.A., Orrington, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] Thomas St. Yves appeals from a judgment of conviction entered in the Superior Court (Washington County, *Kravchuk, J.*) following a jury verdict finding him guilty of manslaughter (Class A) in the death of Faith Ann St. Yves, his infant daughter. *See* 17–A M.R.S.A. § 203(1)(A) (Supp.1999).[1] St. Yves challenges the de-

---

1. St. Yves was also convicted, on his plea of guilty, of abuse of corpse, 17–A M.R.S.A. § 508(1) (1983) (Class D). He does not challenge that conviction. On the manslaughter conviction, he was sentenced to 25 years, all but 20 years suspended, followed by 6 years probation, concurrent with a 364–day sentence for abuse of corpse. His motion for leave to appeal sentence was denied. *See*

nial of his motion to suppress evidence of Faith's remains and the sufficiency of the evidence. We affirm the judgment.

## I. BACKGROUND

[¶ 2] Denise St. Yves, the defendant's wife, gave birth to a daughter, Faith Ann, on January 9, 1998. At the hospital, Denise had identified herself as "Ann Morin,"[2] and she declined to give the hospital her social security number. Denise was accompanied at the hospital by St. Yves and another daughter, Katrina, then three and one-half years old. Because Katrina was still in diapers, was regularly pleading with the hospital staff for food, and otherwise appeared to be a neglected child, hospital staff contacted the Department of Human Services.

[¶ 3] The Department referred the matter to Public Health Nursing, who sent a nurse to attempt to contact the St. Yves family. The address that the St. Yveses had given the hospital turned out to be false, but by January 30, the nurse finally located the St. Yveses' trailer. On five separate visits, however, no one answered the door.

[¶ 4] The Department received another referral regarding the safety of the St. Yves children from a food stamp worker on February 17, 1998. St. Yves had gone to the food stamp office seeking assistance for himself, Katrina, and Faith. While there, he indicated that Denise had left the home altogether, leaving him to care for both children. Asked where his children were, St. Yves had stated that, in order to get the food stamps, he had left them in the care of a person whom he had just met. The food stamp worker was so concerned that she made a referral to Child Protective Services. The worker told the Department that St. Yves was unkempt

and agitated and appeared to have mental health problems.

[¶ 5] Upon this second referral, the Department assigned a child protective services caseworker who attempted to contact the St. Yveses at their home on February 19. No one answered the door, but the caseworker could hear a child inside. After seeking and receiving assistance from the Calais Police Department, the caseworker attempted to contact the St. Yveses again that day without success. The caseworker and police made four additional unsuccessful attempts to check on the children over the next few days.

[¶ 6] The Calais police then discovered that Ann Morin was in fact Denise St. Yves, and that there was an outstanding warrant for her arrest on theft charges in New Hampshire. A search warrant was obtained to allow the police to enter the trailer to search for and arrest Denise. The police arrived, along with a caseworker, and after first requesting admission, began prying open the door. St. Yves opened the door and physically grappled with the officer at the door. To protect the officers during the search for Denise, the one officer placed St. Yves in handcuffs and led him outside. St. Yves claimed that Faith was with "Ann" and the two were in New Hampshire. The police eventually located "Ann" (Denise) in the trailer and placed her under arrest. Contradicting her husband, she claimed that Faith was not with her, but rather was with her grandparents in New Hampshire.

[¶ 7] During the arrest of Denise, the officers observed that the St. Yveses' trailer was quite cold, and was filled with trash and dog urine and feces.[3] Katrina was found in these conditions wearing just a diaper and a t-shirt, and was taken into emergency custody by the caseworker. An animal control officer who had accompanied the police took away two adult

---

*State v. St. Yves*, No. SRP–99–63 (Feb. 10, 2000).

**2.** Or "Ann Moran."

**3.** The officers testified that the smell was so overpowering they had to leave the trailer to breathe fresh air.

Rottweilers and nine puppies. The police took Denise to the station, leaving one officer behind with St. Yves to determine where Faith was. The handcuffs had been removed, and St. Yves and the officer re-entered the trailer.

[¶ 8] As they sat at the kitchen table, the officer spoke to St. Yves, who was alternatively very quiet or crying. The chief of police returned shortly to the trailer, and took part in questioning St. Yves about the whereabouts of his infant daughter. After a short time, St. Yves admitted that Faith was in the trailer, and told them where to find her. When they asked for his consent to search the room indicated, St. Yves said "you'll never find it," went into that room, and returned with a closed box. In the box was the body of an infant girl. It had been wrapped in a garbage bag and blankets and had been placed in a box. The baby had obviously been dead for days. After the officers received the box from St. Yves, they undertook no further search until they had received a warrant.

[¶ 9] An autopsy was performed on Faith's body the next day. The medical examiner testified that, in her opinion, Faith had died from anoxic brain injury; i.e., an injury to the brain caused by loss of oxygen. According to the medical examiner, this was consistent with suffocation caused by holding an infant's mouth closed or by smothering her with blankets. The examiner also testified that an infant could remain alive but comatose for some time after such an injury. The examiner had found no evidence that Faith had died from natural causes.

[¶ 10] St. Yves was taken to the police station and was interviewed by the State Police.[4] St. Yves initially denied harming Faith, but eventually told police that the baby's crying had led him to "retaliate." He told the police that he had tried to close Faith's mouth to stop her crying, and that on several occasions he had placed Faith face down on a couch, covered her with blankets, and pressed down until she stopped crying. He admitted that, after she died, he wrapped her body in plastic, but he asserted that Denise had placed her in the box. He then turned down the heat in the room where the body lay in order to prevent decomposition.

[¶ 11] Denise agreed to testify against St. Yves after pleading guilty to hindering apprehension or prosecution and to abuse of corpse. According to Denise it was St. Yves who had insisted that she check into the hospital under a fictitious name. She said that St. Yves had not allowed her to care for Faith, and that he alone fed, changed, and comforted the infant. One morning he told her Faith was dead and asked her to help him hide Faith's body. Denise assisted St. Yves as they placed the body in a box. She agreed that he placed the box in the front room and turned off the heat.

[¶ 12] St. Yves was ultimately arrested and indicted for manslaughter and abuse of corpse. He filed a motion to suppress the evidence of Faith's body as well as the statements he made at his trailer and at the police station. After hearing, the court found that all of St. Yves's statements were voluntary within the meaning of *State v. Caouette*, 446 A.2d 1120 (Me. 1982), and that St. Yves was not in custody when he was at the police station. It concluded, however, that the statements by St. Yves at his trailer were made under conditions which required that he be notified of his *Miranda* rights.[5]

4. The jury heard tapes of the interview. This was actually the second interview with St. Yves, held February 27, 1998, the day after Faith's body had been discovered. Between the two interviews, the autopsy was performed on Faith's body. St. Yves had spoken to police on the previous evening, and had spent the night in an unlocked cell because he had nowhere else to go. After leaving in the morning, St. Yves returned and was interviewed again. The court declined to suppress statements made by St. Yves made during either interview and that ruling is not challenged.

5. Specifically, the court found that the cumulative circumstances—that the conversation

[¶ 13] With regard to the evidence of the baby's body, the court found that the discovery of the body was inevitable, and alternatively, that exigent circumstances existed which allowed the police to search the trailer for the missing infant. Accordingly, the court denied the motion to suppress the evidence of Faith's body, denied the motion to suppress the statements St. Yves made at the police station, but granted the motion to suppress the statements he made at his trailer while in a custodial setting.

[¶ 14] Before trial, St. Yves moved for a transfer of venue, which was granted after jury voir dire revealed that many of the potential jurors were familiar with the case. The trial was held at the Sagadahoc County Courthouse, where the evidence recounted above was presented to the jury. The jury returned a guilty verdict on the single charge of manslaughter. Following the entry of judgments of conviction and sentencing, St. Yves filed this appeal.

## II. DISCUSSION

[¶ 15] St. Yves appeals from the order on his motion to suppress only with respect to the remains of Faith's body. He contends that Faith's body should have been suppressed as the "fruit of the poisonous tree" because she was found as the result of a custodial interrogation performed in violation of *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Wong Sun v. United States*, 371 U.S., 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding that narcotics seized as fruit of an illegal entry and arrest must be suppressed).

[¶ 16] The Supreme Court has held, however, that the fruit of the poisonous tree doctrine only applies to evidence seized as a result of a violation of *constitutional* rights, and does not apply when the error on the part of law enforcement is merely technical or administrative, such as an error in the administration of *Miranda* warnings. "If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself." *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Thus, the courts have begun to engage in an analysis of "technical" versus "constitutional" errors on the part of law enforcement. *See, e.g., United States v. Byram*, 145 F.3d 405, 409–410 (1st Cir.1998). Here, although the court determined that St. Yves's statements were voluntary, it concluded that he should have been given *Miranda* warnings. The State, therefore, argues that the fruit of the poisonous tree doctrine should not be applied to result in the suppression of the evidence.

[¶ 17] We need not consider whether and to what extent we would determine the *Miranda* violation at issue to have constituted a mere technicality, however, because the evidence is otherwise admissible under the inevitable discovery doctrine.[6] The court determined that because the warrantless search was justified under the doctrines of "inevitable discov-

---

was initiated by the officers, that St. Yves had initially been handcuffed, that his home had been searched, that the officers had indicated to St. Yves that they believed he was involved in Faith's disappearance, and that the interview was lengthy—was a "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (internal quotations omitted). The State does not appeal from the court's order suppressing these statements.

6. Statements made under circumstances that a court has found to be entirely voluntary are not statements obtained as a result of any infringement of the defendant's Fifth Amendment rights. *See United States v. Mandujano*, 425 U.S. 564, 587 n. 3, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). Because the court did not address whether the absence of *Miranda* warnings had a coercive effect on the statements made at the trailer, we do not address the issue here.

ery" or "exigent circumstances" the violation of the *Miranda* requirements did not require suppression. We agree with the court that the child's body would have been discovered by the police even without St. Yves's statements.

[¶ 18] For the inevitable discovery exception to the exclusionary rule to apply, the prosecution must establish, by a preponderance of the evidence, that Faith's body " 'inevitably would have been discovered by lawful means.' " *State v. Storer*, 583 A.2d 1016, 1020 (Me.1990) (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)).[7] We review a finding that evidence would inevitably have been discovered for clear error. *Cf. Storer*, 583 A.2d at 1020.

[¶ 19] At the time that St. Yves retrieved Faith's body and delivered it to the officers, the police lawfully knew that: (1) Denise had given birth to an infant daughter, Faith, under an assumed name; (2) although St. Yves had very recently sought food stamps to support the infant as well as himself and Katrina, the baby was nowhere to be seen; (3) St. Yves's older child, Katrina, had herself not been well cared for—she was found dressed only in a diaper and t-shirt in the cold trailer, and was unfed and neglected; (4) at the food stamp office, St. Yves had been disheveled, confused, and had given an implausible explanation regarding who was caring for the children in his absence; (5) a visiting nurse and caseworker, attempting several times to contact the family at their home, had heard a child's voice but had been unable to get an adult to answer the door; (6) the trailer was cold and was full of refuse, dog feces, and urine; and (7) St. Yves and Denise had given conflicting statements regarding Faith's whereabouts and refused to tell the police where she could be located so that they could verify her safety.[8]

[¶ 20] From these facts, the court concluded that the police would have immediately investigated Denise's claim that Faith was with her grandparents in New Hampshire. Once they determined that she was not there or were not able to locate the grandparents, they would have had probable cause sufficient to seek and obtain a warrant to search the trailer. The court concluded that, in a search of the trailer for Faith, her body would inevitably have been found.

[¶ 21] On the record before us, the court's conclusion is not clearly erroneous. When the State has demonstrated "that the evidence would have been obtained

---

7. In *Nix v. Williams*, Williams was found guilty of the murder of a ten-year-old girl. *See Nix v. Williams*, 467 U.S at 438, 104 S.Ct. 2501. An organized search for the child's body, involving some 200 volunteers over two counties in Iowa, was underway when a police officer spoke to Williams in violation of his Sixth Amendment right to counsel. *See Brewer v. Williams*, 430 U.S. 387, 404, 405, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Williams then led the police to the body, which was two and one-half miles from the nearest search team, but "essentially within the area to be searched." *Nix v. Williams*, 467 U.S at 436, 104 S.Ct. 2501. The Supreme Court, adopting the "inevitable discovery" rule and rejecting any requirement of a showing of "good faith" by the police, held that it was not error, on these facts, for the trial court to conclude the body would inevitably have been discovered. *See id.* at 449–50, 104 S.Ct. 2501.

8. Had the police chosen to search the trailer for the child, they would have been justified in doing so under the "exigent circumstances" doctrine, even prior to final confirmation that she was not in New Hampshire. When a vulnerable infant is missing under circumstances such as these, the police have an obligation to act assertively in locating her. "Exigent circumstances exist when there is a compelling need to conduct a search and insufficient time in which to secure a warrant." *State v. Dube*, 655 A.2d 338, 340 (Me.1995) (citing *State v. Smith*, 593 A.2d 210, 212 (Me. 1991)). That compelling need to search is present when there is reasonable cause to believe that a person is in imminent danger of death or serious bodily harm. *See United States v. Shannon*, 21 F.3d 77, 81–82 (5th Cir.1994); *State v. Stevens*, 311 Or. 119, 806 P.2d 92, 99–100 (1991); *Coker v. State*, 164 Ga.App. 493, 297 S.E.2d 68, 71 (1982).

inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings.... Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a worse position than it would have occupied without any police misconduct." *Nix v. Williams,* 467 U.S. at 447, 104 S.Ct. 2501.[9]

[¶ 22] Because the Calais police would certainly have searched the trailer, with a lawfully obtained warrant, immediately upon determining that Faith Ann's presence with her grandparents could not be confirmed, they would have discovered her body in that search, independent of the evidence obtained from St. Yves. Thus, "[f]airness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place," *id.* and, therefore, the court did not err in determining that the inevitable discovery doctrine saved the evidence from suppression as fruit of the poisonous tree.

[¶ 23] Finally, we conclude that the evidence was sufficient for a rational jury to have concluded that the State met its burden in proving beyond a reasonable doubt each element of the crime of manslaughter. *See State v. Clarke,* 1999 ME 141, ¶ 12, 738 A.2d 1233, 1235.

The entry is:

Judgment affirmed.

---

9. For another example of the application of the inevitable discovery doctrine, see *United States v. Zapata,* 18 F.3d 971 (1st Cir.1994), where the First Circuit held that certain contraband actually discovered as the result of an invalid consent search would have been inevitably discovered by lawful means. *Id.* at 978. Because the car in which the contraband was found was unregistered and uninsured, it "could not lawfully be driven on a public highway, [and] the state police surely would have impounded it." *Id.* Thus, because standard police procedure was to perform a routine inventory search on the impounded vehicle, the court held that the contraband would surely have been found by lawful means. *See id.*