STATE OF MAINE                                    SUPERIOR COURT
AROOSTOOK, ss                                     DOCKET NO. CR-05-075

STATE OF MAINE                          )
                                        )
                                        )
                                        )
vs.                                     )       ORDER ON MOTION
                                        )       TO SUPPRESS EVIDENCE
                                        )
                                        )
CHRISTOPHER SHUMWAY                      )
                    Defendant            )


Pending before the court is the Defendant's Motion to Suppress Evidence. The

Defendant raises six different challenges in this Motion. They relate to:

1. The Caribou Police Department's initial search of the Defendant's Bedroom
   and of his cell phone in Caribou on January 2, 2005.

2. The Maine State Police/Bangor Police Department initial search of Room 242
   at Motel 6 in Bangor on January 3, 2005.

3. The Maine State Police arrest of the Defendant on January 3, 2005 in Room
   242 at Motel 6 in Bangor on January 3, 2005.

4. The Maine State Police search by warrant of Room 242 on
   January 3, 2005.

5. The Bangor Police Department's initial interview of the Defendant on
   January 3, 2005

6. The Maine State Police subsequent interview of the Defendant at the Caribou
   Courthouse on January 4, 2005.

1

# FINDINGS OF FACT

The court conducted a testimonial hearing on March 17, 2006 and has now considered the evidence presented along with the written submissions of the parties. The court makes the following findings of fact.

On January 2, 2005 the decedent Erin Sperry and the Defendant were both employed at Tim Horton's restaurant in Caribou, Maine. Both were working the evening shift on that same date. At some point, late in the evening on January 2, patrons at the restaurant reported hearing a scream and then noticed that no one seemed to be working and that although it was open, the restaurant appeared to be abandoned. The patrons called the local police who responded and discovered what appeared to be evidence of a violent struggle.

The police officers determined that neither Ms. Sperry nor the Defendant was at Tim Horton's working their assigned shifts. Police interviewed other Tim Horton employees and determined that money, including both currency and rolled coins, appeared to be missing from the office area of the restaurant and that Ms. Sperry's car was gone. They discovered blood on the floor of the bathroom and what appeared to be drag marks in that blood. They also discovered loose pieces of women's jewelry strewn on the floor. The local law enforcement officers quickly deduced that something untoward had occurred at the restaurant involving the Defendant and Ms. Sperry. The Caribou officers enlisted the assistance of Maine State Police detectives in undertaking an immediate investigation. These investigative efforts rapidly expanded beyond Caribou, down I-95 all the way to Bangor.

Bangor based Maine State Police Detective Stephen Pickering was at home during the early morning hours of January 3, 2006. Detective Pickering has been with the Maine State Police for 28 years. He has been a sergeant with supervisory and administrative responsibilities for the past 3-½ years and he has been a detective with investigative responsibilities for homicides and major crimes for approximately the past 20 years.

Maine State Police Detective, Dennis Appleton, assigned to Aroostook County called Det. Pickering at approximately 3 am on January 3, 2006 and advised that he was investigating a situation in Caribou and that developing evidence indicated that Tim Horton's employee Christopher Shumway had apparently abducted and murdered his supervisor, Erin Sperry, and that he appeared to be headed towards Bangor. Det. Appleton advised Det. Pickering that other law enforcement officers had found a vehicle matching the description of Ms. Sperry's vehicle off the road along the I-95 interstate. He also advised that the body of a young deceased female matching the description of Erin Sperry was in the vehicle. The body displayed traumatic injuries. Det. Appleton also reported that there was fresh snow in the immediate vicinity of the vehicle and that there was only one set of footprints leading away from the vehicle towards the road way.

Det. Pickering got up and dressed himself. He immediately called to enlist the aid of officers from the Bangor Police Department. He asked that those officers commence a canvassing of Bangor area hotels and motels to determine if the Defendant had rented a room at one of them. The Bangor officers quickly determined that the Defendant had checked into Room 242 at the Motel 6 in Bangor. Det. Pickering called Bangor Police

3

Detective Darryl Peary to request that he respond to the motel and then he also departed his home for the motel.

Investigating officers determined that the Defendant had checked into Room 242 at 2:13 am on January 3, 2005. It appeared that he had paid for his room with cash, including some rolled coins that were consistent with rolled coins reported missing from Tim Horton's.

While awaiting the arrival of Det. Pickering, several Bangor police officers remained at the motel and maintained surveillance on the Defendant's room, commencing between approximately 2:30 am and 2:45 am.

Det. Peary lived closer to the motel and he arrived at approximately 4 am; shortly before Det. Pickering. By this time, there were a number of Bangor police officers present including Bangor Police Department detectives Anna Fizell and Darryl Perry. When Det. Pickering arrived, he became the primary officer on the scene. He decided to call Assistant Attorney General Andrew Benson to apprise him of the situation and to get guidance on how to proceed.

The officers formulated a plan to establish contact with the Defendant and engage him in conversation regarding the circumstances surrounding the death of Erin Sperry. They first knocked at the door of Room 242 to determine if the Defendant would answer the door. He did not and there was no other response to the knocking. A few minutes later between 5:00 am and 5:15 am, Det. Pickering instructed an officer to place a call to the room. He did so, however, although Det. Pickering and the other officers could hear the telephone ringing from inside the room, no one answered the call. Det. Pickering testified that when there was no answer to the phone call, he made the decision to do a

4

"well-being" check. He said that he based this decision on his experience that people who find themselves in circumstances similar to the Defendant's will sometimes take their own life.

Det. Pickering acknowledged that by 5:15 am, law enforcement officers had a substantial basis to believe that the Defendant had abducted and murdered Erin Sperry. He also acknowledged that for all intents and purposes, the Defendant was isolated in his motel room and surrounded by police officers. There was no evidence that anyone else was with the Defendant. There was no evidence that he was armed. There was no evidence that he was aware of a police presence in the vicinity of his room. There were no strange smells or smoke; nor any other indicators that something might be wrong with the Defendant. There was no indication that the Defendant's lack of response might simply have been attributable to his having been asleep at that early morning hour. There also continued to be no sounds coming from Room 242.

It is obvious that police authorities had a strong interest in speaking with the Defendant about the events originating at Tim Horton's restaurant in Caribou. Both Det. Pickering and Det. Peary acknowledged this. Establishing contact with the Defendant to see if he would talk with the police was the main purpose underlying the initial knock and the subsequent phone call to Room 242. The officers never abandoned this objective. However, when neither their knocks nor their phone call produced a response from anyone inside the room, the officers considered a number of different possible explanations for this lack of response.

One explanation would be that the Defendant was simply asleep at that early morning hour. Another possible explanation was that the Defendant had harmed himself

and was unable to respond. Det. Pickering testified that based on his many years of experience, he knew that it was a common occurrence for people involved in intense circumstances such as those unfolding on January 3 to harm themselves resulting in a murder suicide event. Detective Pickering testified that the lack of any response to either knocking or to a phone call was a key factor in his determination to enter the room.

Det. Pickering obtained a room passkey from motel management and opened the door. A security chain prevented him from opening the door completely. The officers did not try to establish verbal contact with the Defendant through the open door, instead, Det. Pickering instructed one of the other officers to force the door open and the officer kicked in the door. At least three Bangor police officers went all the way into the room; they had their weapons drawn.

The offices found the Defendant sitting on the bed. He did not appear to be in any distress. One officer quickly checked the bathroom for weapons but found none. It was readily apparent that the Defendant was fine. Det. Pickering then asked if the Defendant would be willing to talk with them at that point or if they should get a warrant.[1] The Defendant immediately responded that he wanted the police to obtain a warrant. Det. Pickering signaled to the other three officers to leave and all of them immediately did so, closing the door behind them at approximately 5:30 am. The police entry, observation of the Defendant, brief verbal exchange and exit took approximately 30 to 45 seconds.

As a result of this entry, the police obtained neither physical nor testimonial evidence. They made no observations of anything other than that the Defendant was in

---

[1] The testimony did not indicate whether the Defendant and the officer were speaking of a search warrant or an arrest warrant.

the room and unharmed; they asked no questions other than regarding whether the Defendant would consent to speak with them.

Det. Pickering decided to consult with the AAG again and after a brief telephone conversation, he decided to begin preparations for obtaining a search warrant. Det. Pickering and Det. Peary left the motel to go to the Bangor police department to begin drafting a search warrant application. From ongoing contacts with police authorities in Aroostook County, Det. Pickering had continued to acquire additional information pertaining to the situation and by 5:30 am he felt that he had probable cause to believe that the Defendant had committed the crime of murder against Erin Sperry.

Det. Pickering testified that he continued to evaluate the appropriate course of action and that after further discussions he decided not to wait for a search warrant. He testified that he had ongoing concerns regarding the Defendant's well being and he also had concerns regarding the spoliation of evidence. Accordingly, Det. Pickering sent Det. Peary and several Bangor police officers back to the motel for the purpose of arresting the Defendant. At approximately 6:45 am. Det. Peary and 5 or 6 other officers went to Room 242, entered without either a search warrant or an arrest warrant and arrested the Defendant for the crime of murder. Det. Pickering was not present for this entry and arrest.

Upon entering the room, Det. Peary observed the Defendant with a broken telephone cord around his neck. He appeared to have ligature marks on his neck and superficial cut marks on his wrists. Det. Peary concluded that the Defendant had made efforts to take his own life prior to the time that the police had entered. Det. Peary ordered the Defendant to get down on the floor and advised him that he was under arrest.

7

It did not appear to the officers that the Defendant required any immediate medical attention, so they did not take him for examination or evaluation by any medical personnel. Instead, the officers took the Defendant into custody and transported him directly to the interview room at the Bangor police station.

Subsequent to the initial police entry into Room 242, there had been no apparent change in the surrounding circumstances, other than perhaps that the Defendant, who may not previously have known the police were aware of his location was now himself aware of a police presence at the motel and further he knew that the police were probably engaged in the process of getting a search warrant or an arrest warrant or both. Except for the police entry itself, there was no perceptible activity going on regarding Room 242 since police first arrived around 2:30 am.

In the meantime, Det. Pickering conferred with Maine State Police Det. John Cote in Caribou regarding obtaining a search warrant for Room 242 at Motel 6. Maine State Police Det. Daryl Pelletier to begin the process of applying for a search warrant. Within a few hours, the officers had obtained a warrant authorizing a search of Room 242. Maine State Police and Bangor Police Department officers executed that warrant and conducted a search of the motel room that same day.

Bangor Police Detective Anna Fizell and Det. Peary interviewed the Defendant at the Bangor police department. The interview room is approximately 4' by 8'. It contained a small table and three chairs. There are no windows. There is only one door. A telephone is located on the table. The interview was videotaped. The officers commenced the interview by introducing themselves as police officers and asking the Defendant if he would agree to speak with them. The Defendant agreed. The officers

then read to the Defendant his Miranda rights. After advising the Defendant of each of his rights, they asked him if he understood that right. They confirmed his understanding of his rights by having him recite back to them his understanding of what the right involved.

From the court's view of the videotape, it is apparent that during the interview, the Defendant sat slumped in a chair. The Defendant's mood was subdued and he was despondent and dejected. He stated several times that he wanted to die. The volume of his speech was low, at times barely audible. Nonetheless, the Defendant responded to their questions appropriately. Through out the interview, he appeared conscience-stricken and self-reproachful. His intellectual capacity was not impaired by drugs or alcohol. It is clear to the court that he understood everything that the officers were saying to him.

Both of the interviewing officers were dressed in plain clothes. The videotape makes it clear that the tone of their speech was conversational and indeed, compassionate. Neither displayed any manner or attitude of hostility or aggression towards the Defendant during the interview. There was no evidence of coercion or other effort to overcome the Defendant's free will. The interview lasted approximately one and one half hours.

All of the evidence indicates that the Defendant is a person whose intellectual level falls at the high end of average. All of the evidence indicates that the Defendant understood the literal meaning of all of the words used during the course of his interview and that his responses were appropriate to the questions asked.

On January 4, 2005, law enforcement officers transported the Defendant to the Caribou Courthouse for purposes of his initial post arrest appearance before the court.

9

Prior to the Defendant's appearance in court, Maine State Police Det. Dale Keegan and Det. Darryl Pelletier approached the Defendant while he was speaking with his parents in the law library downstairs at the Caribou Courthouse. Det. Keegan asked if the Defendant would be willing to speak with them. The Defendant agreed. The Defendant's parents were not present during the interview. Both officers were dressed in plain clothes. Det. Keegan advised the Defendant of his Miranda rights; the Defendant acknowledged that he understood them and he was able to explain his understanding of each right to the officer after he was advised of that right. The interview was tape recorded but not videotaped.

Although the Defendant's mood remained subdued, his responses were appropriate to the questions posed and appeared to be freely given. There is nothing in the audiotape to suggest to the court that the Defendant did not understand his rights. The officers made no effort to coerce or force responses from the Defendant.

At hearing of this motion, each party presented expert testimony regarding the Defendant's competency to waive his Miranda rights during each interview. The State called Dr. Ann LeBlanc, Ph.D, Director of the State Forensic service. The Defendant called Dr. Ronald Brown, Ph. D, a licensed clinical psychologist in private practice. Dr. LeBlanc devotes her entire professional employment to forensic psychology. Dr. Brown devotes approximately 20% of his practice to this endeavor. These experts expressed a shared opinion that the Defendant's intellectual level of functioning would fall in a range near the high end of average intelligence. They also agreed that the Defendant understood the literal meaning of the words used in the police officer's advice of rights in each

10

instance. They differed in their opinion regarding whether the Defendant suffered from a major mental illness. Dr. Brown opined that the Defendant displayed indicators of delusional thinking because he made references to an apparently non-existent character named Leon who the Defendant suggested had been a witness to his attack upon Ms. Sperry and who was in hot pursuit of him to exact vengeance. He concedes that there is little objective evidence that the Defendant suffers from a major mental illness. The essential basis for Dr. Brown's opinion on this point is the Defendant's own self report of "Leon", a report that he did not make to either Dr. LeBlanc or Dr. Schetky during the Stage II evaluations. Dr. LeBlanc opined that although the Defendant suffered from posttraumatic stress disorder and was incredibly lacking in interpersonal social skills, he did not display any symptoms of psychosis or any other major mental illness.

Dr. LeBlanc and Dr. Brown also differed on the ultimate question regarding the Defendant's competency to make a knowing and informed waiver of his rights.[2] In formulating his opinion, Dr. Brown used a set of criteria developed by a Dr. Grisso, a widely recognized expert in the field. Dr. Brown opined that because the Defendant's responses in his interviews did not make it clear that the Defendant understood that by waiving his rights he set the adversarial process in motion and because he did not manifest any indication that he engaged in a weighing of the consequences of waiving his rights versus not waiving his rights, there could be no effective waiver.

DISCUSSION AND DECISION

**1. Initial Search of the Defendant's bedroom and of his cell phone on January 2, 2005.**

---

[2] Neither Dr. LeBlanc nor Dr. Shetky were asked to evaluate the Defendant's competency to waive his rights as part of their evaluation. The Defendant retained Dr. Brown for this specific purpose.

The parties have agreed that the State will not use either the Defendant's cell phone or any derivative information obtained from the cell phone at trial. This stipulation obviates the need for any court ruling on this challenge.

**2. Initial police search of Room 242 at Motel 6 on January 3, 2005.**

It is undisputed that police officers had no warrant authorizing their entry into the Defendant's room on January 3, 2005. Accordingly, a police entry could only be authorized by the existence of probable cause plus the existence of exigent circumstances. State of Maine v. Phillip Destafano and Kenneth Foisy, ANDSC-CR-85-273, (Me. Super. Ct., And. Cty., May 27, 1986) (Lipez, J.) (citing State v. Boilard, 488 A.2d 1380, 1385 (Me. 1985). By the time of the initial entry in this case, police officers clearly had probable cause to believe that the Defendant would be found within Room 242 and probable cause to believe that he had committed a violent crime against Erin Sperry. The court finds however that although there was ample probable cause to believe that the Defendant had committed a violent crime against Erin Sperry, exigent circumstances did not exist to justify the entry and that police entry into the Defendant's hotel room was not permitted without a warrant.

Whether or not exigent circumstances exist is always case specific, but courts have found such circumstances to exist where there was "hot pursuit"; threatened destruction of evidence; risk that a suspect may flee undetected; and if there were danger to the public or to the police. See U.S. v. McMackin, 2002 U.S. Dist. Lexis 15608 (D. Me. Aug. 20, 2002). None of those circumstances existed in this case nor any other circumstance that would have constituted a true emergency that did not allow police an opportunity to obtain a warrant.

In this case, the State points to Det. Pickering's testimony that he felt the need to do a "well-being check" as the basis upon which to justify the initial entry into Room 242. The State also suggests there was a concern regarding the spoliation of evidence. In a hypothetical sense these are valid considerations. Based on Det. Pickering's many years of experience, there could be a valid and legitimate basis to consider the possibility that the Defendant might harm himself or otherwise might be in need of aid. Additionally, there is always the possibility that a Defendant might destroy evidence in his possession once he perceives that apprehension by law enforcement officers is imminent.

However, based on the evidence presented, this court cannot conclude that a threat of harm to the Defendant or the risk that evidence might be lost is anything other than a mere possibility. The police had determined that the Defendant was present in Room 242 shortly after he checked in. They were able to secure the premises and thereby virtually assure that he could not leave the room without police awareness. There were no sounds or smells or indicators of distress. Although the police point to the absence of a response to either a knock at the door or a call to the room, the absence of a response is as consistent with sound sleep or just a desire to be left alone as it would be with emergent need. The court concludes that more evidence than is present here is required to support a finding of exigency. In the court's opinion, a finding of exigency requires a demonstration of some specific threat of a particular harm to a particular person or some specific threat to particular evidence to lift these contentions out of the realm of speculation. Cf. Id. (citing, United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995). Clear evidence found after entry that the Defendant had in fact attempted to harm

himself does not alter the court's conclusion. The validity of the police entry must be determined upon the basis of what information was available prior to entry and not by what was found after entry.

Accordingly, the court concludes that exigent circumstances did not exist at the time of the initial police entry and that the entry therefore violated the Defendant's Constitutional Rights under the Fourth Amendment.

As a consequence of this violation, the Defendant urges the court to suppress all evidence obtained as the result of this violation pursuant to the "fruit of the poisonous tree" doctrine. Wong Sun v. United States, 371 U.S. 471, 484 (1963). However, it is not clear that the violation bore any "fruit" at all. The "fruit of the poisonous tree" doctrine only applies to evidence obtained a result of the violation of constitutional rights. State v. St. Yves, 2000 ME 97, ¶16, 751 A.2d 1018, 1022. It does not appear that police obtained any physical evidence or any verbal evidence during this initial entry. They made only a brief observation of the Defendant in the room.

As events continued to unfold during the day on January 3, 2005, the bases for police probable cause continued to grow and clearly it was only a matter of time before police effected the Defendant's arrest and made essentially the same observations of the Defendant that they made during the initial entry. Even if there were violations of constitutional rights, when a preponderance of the evidence establishes that the police would have inevitably have obtained disputed evidence exclusion is not required. See State v. Thomas St. Yves, 2000 ME 97, ¶ 18, 751 A.2d 1018, 1023. The court finds that it was inevitable, indeed within a very short time, that the police were going to make the same observations of the Defendant that they made during the initial entry to his room.

Thus the court concludes that any taint associated with this entry would be removed by the "inevitable discovery doctrine".

The court finds that the initial entry was unlawful but declines to order the suppression of any evidence in this case based upon the initial warrantless entry.

### 3. Arrest of the Defendant at the time of the second entry to Room 242

The court finds that the second police entry into Room 242 also violated the Defendant's Fourth Amendment rights. This too was a warrantless entry and the evidence fails to establish any exception to the warrant requirement, such as consent or exigency. Although, the police had apparently begun the process to obtain either an arrest warrant or a search warrant, or both, they had obtained neither. Rather than wait for the warrant, they grew impatient, and entered Room 242 in order to arrest the Defendant.

It is quite clear that by the time of this arrest, the police had ample probable cause to arrest the Defendant for murder. However, they did not have a warrant to enter or a warrant to arrest the Defendant who at that time was in his motel room, the substantial equivalent of his home. There were no exigent circumstances.

In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court of the United States held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. While murder is hardly a "routine felony", the court can find no different standard for murder cases. Thus it appears to the court that the second police entry into Room 242 was also unlawful.

15

The Defendant seeks to have all of the evidence in this case, including his subsequent statements to the police, suppressed. Notwithstanding its conclusions regarding the validity of the police entry, the court agrees with the State that the Defendant is not entitled to this relief.

In New York v. Harris, the Supreme Court wrote:

Even though we decline to suppress statements made outside the home following a Payton violation, the principal incentive to obey Payton still obtains; the police know that a warrantless entry will lead to the suppression of any evidence found, or statements take, *inside the home*. (emphasis supplied)...We hold that, where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton. New York v. Harris, 495 U.S. 14, 20-21 (1990).

It does not appear that police actually seized any physical evidence from Room 242 or obtained any verbal evidence while at the motel. Obviously, they seized the Defendant and his clothing and pocket contents, but there was no other evidence obtained. The Defendant argues that everything should be suppressed. The court disagrees. First, aside from the Defendant's clothing and pocket contents, there is no evidence to suppress. Second, it appears to the court, that the police gained no greater access to the Defendant's clothing and effects by virtue of their unlawful entry than was inevitable. It seems to the court that the Defendant's arrest was imminent under any scenario and that the police were soon going to obtain possession of all of these same items either pursuant to a warrant that was in process or incident to an imminent arrest.

The Defendant made no statements while at Room 242; the police obtained no physical evidence; they made no observations that were not inevitable. Harris indicates that only evidence obtained by virtue of an illegal entry are subject to suppression on the

16

basis of such a violation. Id. at 19. Accordingly, the court declines to order suppression of any evidence on the basis of the second violation of the Defendant's Fourth Amendment rights.

**4. The Maine State Police Warrant Search of Room 242 on January 3, 2005.**

The Defendant argues that the underlying affidavit supporting the issuance of the search warrant contains information illegally obtained during the illegal entries discussed above and that this invalidates the search warrant. While the affidavit does contain information obtained during both unlawful entries (See paragraphs 11 and 13), if this information is simply disregarded, ample probably remains for issuance of the search warrant. Accordingly, the court denies the request to suppress any evidence obtained during the warrant search.

**5. The Bangor Police Department's initial interview of the Defendant on January 3, 2005.**

A confession is admissible only if voluntary. State v. Philbrick, 481 A.2d 488, 494 (Me. 1984). "A confession is voluntary if it results from the free choice of a rational mind, if it is not the product of coercive police conduct, and if under all circumstances its admission would be fundamentally fair." State v. Mikulewicz, 462 A.2d 497, 501 (Me. 1983). The court finds that the Defendant was appropriately advised of his rights at the time of this interview; that he understood them; that he was competent to make a knowing, informed and voluntary waiver of those rights and that he in fact did so prior to answering the officers' questions at the Bangor police department on January 3, 2005.

The Defendant has offered Dr. Brown's testimony that the police interview cannot withstand scrutiny under a methodology and standards developed by Dr. Grisso. Dr.

17

LeBlanc is also familiar with Dr. Grisso's work and although she agrees with his basic methodologies, she did not apply them in this instance. There is no evidence in the record that any existing law or professional standard of care requires adherence to Dr. Grisso's methodology. Thus, it would appear to the court that Dr. Grisso's approach is simply one approach that a mental health professional may or may not subscribe to.

Dr. LeBlanc did not reach the same conclusions as Dr. Brown regarding the question of the Defendant's competence to waive his Miranda rights. Reasonable and competent experts can and often do disagree on critical questions. This is one of those cases.

The court has watched the videotaped interview and has listened to the audio taped interview. Although the Defendant was despondent and overwhelmed by the enormity of what he believed he had done, this emotional state was not inappropriate to his circumstance and in the court's opinion his emotional and psychological state did not preclude him from making informed and voluntary choices under the law. A person may be overwhelmed with remorse and regret and seek to relieve a guilty conscience by accepting responsibility. Making this choice, as it appears the Defendant did, does not render him incompetent. That a different person might have engaged in further reflection or deliberation or might have engaged in a more disciplined evaluation or responded to different stimuli and thereby have reached a different decision regarding waiver, does not dictate a finding that the Defendant was incompetent for having made his choice in the manner that he did or for the reasons that he did.

The court concludes that Dr. LeBlanc's assessment of the Defendant's competence in making his waiver is the more persuasive one and most consistent with the

court's own observation of the Defendant as he appears in the videotape. Accordingly, the court finds that the Defendant did understand his rights and that he made an informed, knowing, and voluntary decision to waive those rights on January 3, 2005.

**6. The Maine State Police subsequent interview of the Defendant at the Caribou Courthouse on January 4, 2005.**

The Defendant makes the same challenge to the second interview. Based on its listening to the audio taped interview and accepting the opinion of Dr. LeBlanc rather than of Dr. Brown, the court finds that the Defendant made a knowing and voluntary waiver of his rights at the time of this second interview as well.

The entry shall be: The Defendant's Motion to Suppress is denied

Date: June 5, 2006

_____
JUSTICE, SUPERIOR COURT

FILED & ENTERED
SUPERIOR COURT

JUN 1 4 2006

AROOSTOOK COUNTY